411 N.E.2d 372 (1980)
F.J., Appellant-Defendant,
v.
STATE of Indiana, Appellee-Plaintiff.
No. 2-677A220.
Court of Appeals of Indiana, Fourth District.
September 29, 1980.
Rehearing Denied October 24, 1980.
*373 John Blumenthal and Jonathan E. Butterfield, Indianapolis, for appellant-defendant.
Theodore L. Sendak, Atty. Gen., Indianapolis, for appellee plaintiff.
MILLER, Judge.
This action consolidates appeals from a temporary civil commitment of respondent F.J., a 29 year old physician, to Larue D. Carter Memorial Hospital and from the subsequent extension of such commitment. *374 Both proceedings were brought pursuant to Ind. Code 16-14-9.1-1 et seq., an act pertaining generally to the care and treatment of mentally ill persons. With respect to her initial temporary commitment F.J. challenges the sufficiency of the evidence supporting her commitment and the constitutionality of the commitment statute. Additionally, she contends there were various procedural irregularities in her commitment hearing. Her further appeal-from the extension of such commitment-challenges only the constitutionality of the appropriate statute.
Although our decision determines the relevant statute is not constitutionally defective, and thus that the second commitment must stand, we further conclude the initial temporary commitment was in error. More specifically, we hold that the evidence presented at such hearing did not rise to a level even approaching "clear and convincing" proof, in part because the evidence in support of such commitment failed to reveal the testimony of at least one physician who had "personally examined" F.J. to determine her mental condition within the meaning of IC 16-14-9.1-7(e)(3). Accordingly, we affirm in part and reverse in part.
Our discussion of the facts relevant to the background of this case first observes that the appropriate statutory procedure concerning treatment of mentally ill persons prescribes three types of involuntary commitment or detention, all of which are pertinent to the procedures employed with respect to F.J. See IC 16-14-9.1-3. These three types are emergency detention, which may not exceed 72 hours; temporary commitment, which may be for 90 days and is renewable upon appropriate procedures for up to an additional 90 days and regular commitment, which may be for an indefinite period. See IC 16-14-9.1-7 et seq.
The record reveals F.J. was initially committed in 1977 to the Regional Mental Health Center in Kokomo pursuant to an application for 72-hour emergency detention filed January 26 in the Miami Circuit Court by her parents. That petition, which appears to have complied with the appropriate statute requiring a physician's statement based on examination or on information given such physician,[1] recited that one Dr. D.C. Reyes of Miami, Indiana had examined F.J. on January 26 and found she might endanger someone if she drove an automobile and that based on information supplied to him he was also of the opinion F.J. was mentally ill and dangerous.[2] No error has been raised with respect to the emergency detention of F.J.
As noted above, F.J.'s two appeals concern her later temporary commitment and the 60-day extension of that commitment. Pursuant to IC 16-14-9.1-8, commencement of a temporary commitment may be accomplished either voluntarily, as provided in subsection (a) of that statute, or as follows:
"(b) By an order of the court having jurisdiction over the person alleged to be mentally ill and either dangerous or gravely disabled following emergency detention.

*375 (c) By the filing with a court having jurisdiction in the county of residence of the person or in the county where the person may be found of a written petition by a person eighteen [18] years of age or older. The petition must include a physician's written statement which states that:
(1) he has examined the person within the past thirty [30] days; and
(2) he is of the opinion that the person is mentally ill and either dangerous or gravely disabled and in need of custody, care, or treatment in an appropriate facility." [Emphasis added]
We note that where a commitment is initiated by court order pursuant to subsection (b), provision is made that a hearing date may not be later than 10 days from the order, presumably because the person alleged to be mentally ill is already being detained under an emergency detention. IC 16-14-9.1-9(b). By contrast, where a petition is employed under subsection (c) to commit an individual who is not then under detention the hearing may not be held in less than 10 days from the date of an appropriate notice. Id.
It is of some significance that F.J.'s temporary commitment was not commenced under subsection (b) by a court order based on a probable cause report from the facility where she was detained for 72 hours and indeed there was no such report in the record, although a probable cause report is clearly mandatory where an emergency detainee is temporarily committed. In particular, the appropriate statute requires a superintendent's report which asserts either probable cause for a maximum 90-day detention, or the lack of such probable cause, in which case discharge is appropriate. IC 16-14-9.1-7(b)-(e). It may well be that the Legislature contemplated such a probable cause report should be the exclusive initiating procedure for a temporary commitment where there has been a previous emergency detention, although the parties to this appeal do not raise this issue concerning the commencement of F.J.'s temporary commitment.
In the instant case, such commitment of F.J. was commenced when her parents filed, pursuant to subsection (c), a petition on February 3, 1977, this time seeking a commitment for up to 90 days and alleging she was mentally ill and might come to harm on account of her inability to provide herself with food, clothing, shelter or other essential needs. That petition was supported by a statement from a Donald L. Roegner, M.D., otherwise unidentified as to specialty, who stated he had examined F.J. on February 2 and found her mentally ill and "dangerous and gravely disabled." See IC 16-14-9.1-8(c)(2).
A hearing on such petition was set for February 4, the next day, at 10 a.m., and was apparently commenced at that time.[3] The record shows notices of that hearing were served by the sheriff on the day of the hearing "by reading [them] within the hearing" of F.J., her father, and James A. Grund, prosecuting attorney for Miami County. The evidentiary portion of the hearing began in the afternoon on February 4, at which F.J. was apparently represented by a deputy prosecuting attorney James H. Grund. There was testimony by F.J. herself, Dr. Reyes, Mrs. Linda Rusie, F.J.'s father and her mother. Based on such testimony, F.J. was found to be mentally ill and gravely disabled and ordered committed to Larue D. Carter Memorial Hospital for a period not to exceed 90 days. As noted above, she initially appeals that commitment order.
Her second appeal considered herein follows from the later extension of the original 90-day temporary commitment. On April 26 Dr. Donald F. Moore, medical director at Larue D. Carter, filed with the circuit court pursuant to IC 16-14-9.1-9(i) a petition for extension of the temporary commitment, stating F.J. was mentally ill, dangerous and gravely disabled, and that it *376 was in her best interest to continue receiving treatment. At about the same time he filed with the court a certificate recommending the regular commitment of F.J. pursuant to IC 16-14-9.1-10. Following a hearing on May 18, 1977, the temporary commitment of F.J. was extended for a period not to exceed 60 days.[4]
Of the various arguments employed by F.J. to attack her initial temporary commitment on February 4, we need only consider one: whether there was sufficient evidence at the hearing under an appropriate standard for the court to conclude, pursuant to IC 16-14-9.1-9(g)(2), she was "mentally ill and gravely disabled." We conclude there was not.
We first summarize the evidence which was presented at that hearing. Thus, there was testimony from F.J. herself that as a medical doctor she had completed her internship and four months of a residency in family medicine in Florida. She also stated that at various times she had traveled from Florida back to her home town in Indiana, most recently to get advice from her parents, the petitioners in the instant action, whether to practice in her home town or elsewhere. During at least one of those trips to Indiana she worked with Dr. Reyes. Her father, a petitioner in this action, stated F.J. had not otherwise worked since 1975, when she failed to renew a position when her contract ran out, and that "the main reason for this whole thing was to keep her here so she wouldn't go back to Florida, and then we realized that we had to have somebody help us to get her some treatment, ... ." He generally asserted that F.J. was unable to properly take care of herself, in that she would eat too little and had a phobia regarding eating, and that she "stays up all night till 2 o'clock in the morning and sleeps all day the next day." He also stated F.J. was not violent, although she would become angry with her parents for "no reason whatsoever." F.J.'s mother contributed no evidence of substance, stating in essence she would go along with whatever the doctors found.
The testimony of Dr. Reyes may be taken to corroborate the conclusion F.J. did not eat sufficient food, since he testified that at 92 pounds she was perhaps twenty pounds below a "normal" or "good" weight for her of 110 to 112 pounds. It is not clear there was any sudden weight loss, nor was there any testimony she had ever weighed more than about 102 to 106 pounds, which F.J. stated was her weight in high school. Also significant is the caveat attached to Dr. Reyes' conclusion that F.J. "should be hospitalized to the extent that we should give the psychiatrist ... a free hand, to determine how much hospitalization is necessary":
"[T]o me, this is my impression, there is a melancholy type or schizophrenic reaction, I am not a psychiatrist, I don't want you to take it from me, I want a psychiatrist to elaborate on it, but definitely there are some patterns of schizophrenic type of reaction." (Emphasis added.)
There was no testimony at the hearing from a psychiatrist. Dr. Reyes also testified he had known F.J. for about six years, and that eight to ten months before trial, the petitioners had contacted him and told him F.J. was "not behaving quite well". Thereafter, Dr. Reyes took F.J. with him on some house calls and hospital rounds, during which time he had occasion to observe, according to his testimony, that she talked superficially and giggled inappropriately, and that she acted unusually on two occasions. One was when F.J. became "petrified" upon observing a crushed victim of an overturned tractor during one of Dr. Reyes' calls as county coroner. He further testified that on another occasion he gave her a simple pre natal to handle, and that "I left at 3:30, when I came back, almost five o'clock I see she is still with the same *377 patient. You cannot make a living, I said, to be with one patient the whole afternoon." Dr. Reyes further testified that F.J. was "very severe" during verbal battles with her parents over her plans to go back to Florida, and that her parents "don't have any control on her, she does what she wants-."
Finally, there was testimony from one Mrs. Rusie, deputy sheriff and matron at the county jail, that she had observed and had conversations with F.J. a few times (apparently during the emergency detention process), and that F.J. would laugh inappropriately during otherwise quiet moments, would not always respond to questions asked of her and would fail to follow conversations. No medical records or exhibits were introduced into evidence at the February 4 hearing.

SUFFICIENCY OF EVIDENCE AT FIRST COMMITMENT HEARING
Regardless of the kind or quantity of evidence submitted at any commitment hearing, it is evident that in many cases a court will have difficulty in determining the propensity of a particular individual to harm himself or another, or that person's inability to provide for his essential needs. Nevertheless, because determination of such difficult questions must be made, our statutes provide for a temporary commitment where, after a proper hearing, a court determines an individual is mentally ill and either "dangerous" or "gravely disabled". IC 16-14-9.1-9(g). In this regard "mental illness" is statutorily defined as "a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function" and that "gravely disabled" means "a condition in which a person as a result of mental illness is in danger of coming to harm because of his inability to provide for his food, clothing, shelter, or other essential human needs." IC 16-14-9.1-1(a), (b). As noted above, such temporary commitment is initially for no more than 90 days, and the court order must require that a treatment plan be filed within 15 days of the person's admission to the appropriate facility. IC 16-14-9.1-9(g).
To minimize the risk that any individual will be deprived of his liberty even for 90 days where it is unwarranted, the proper procedure requires not only that the court's order be based upon sufficient evidence, but also that numerous procedural protections be afforded at the temporary commitment hearing, including proper notice and the right of the purportedly dangerous or gravely disabled individual to receive a copy of the appropriate order or petition, to be present at the hearing and present and cross-examine witnesses, to be represented by counsel, and to receive a change of judge. IC 16-14-9.1-9(d), (e), (f).
These procedures were not observed in the initial temporary commitment of F.J., most conspicuously in the court's failure to require sufficient evidence that she was either "mentally ill" or "gravely disabled" as alleged in her parents' petition. Indeed, the testimony of her parents was largely conclusory-consisting mainly of assertions that they stand on the findings of the doctors who have examined her-and as noted above, it was concluded by her father that the main reason for having F.J. committed was to prevent her from returning to Florida. Although F.J. was accused of becoming angry for no reason whatsoever, her father acknowledged she was not violent and had never threatened him. Similarly, although F.J.'s father generally asserted she was unable to properly take care of herself, his own testimony suggests her sleep habits were not so much inadequate as irregular, and his assessment of her alleged phobia regarding the intake of food merely vaguely concluded "I don't think anybody could cope on what she eats." Later testimony suggests F.J. was possibly 20 pounds underweight, although as noted earlier her usual weight was never established, nor can we glean from the evidence any clear indication of whether there was a sudden recent weight loss. Most significantly there was no clear connection between any weight loss and a mental illness or that she was disabled thereby. In addition, when F.J.'s father was asked whether her employment *378 contract was not renewed or whether F.J. herself failed to renew it, he responded that it was F.J. who failed to renew the contract.
As was also noted above, there was no evidence at the February 4 hearing from any psychiatrist, although Dr. Reyes, apparently a family friend and general practitioner, did testify. He indicated, however, that he would like to have his opinion of F.J. confirmed by a psychiatrist. And, further, in connection with his statement it was his impression there was a melancholy type or some pattern of schizophrenic reaction, he stated "I don't want you to take it from me, I want a psychiatrist to elaborate on it." Moreover, it does not appear he even believed F.J. required hospitalization because she was "gravely disabled", since he testified only that hospitalization was "necessary to insure that a psychiatrist "will have a better way of making a better impression and making better treatment, because this has been going on for years." He also ultimately conceded that "if she will agree to go for treatment, I think that's all that's necessary, to cooperate."
We believe such statements by Dr. Reyes must be considered in order to understand and properly evaluate his testimony, although it is not doubted that even such qualified evidence is entitled to some weight in a commitment proceeding. In further examining his testimony we must also consider, moreover, various other factors which tend to diminish its value, among them the fact that many if not all of Dr. Reyes' observations were apparently made long before the February 4 hearing, and-as we consider in more detail below that such observations were clearly those of a family friend rather than a diagnosis or prognosis made in Dr. Reyes' capacity as an examining physician.
Although the statute prescribes no specific time limit governing the report of an examining physician at a temporary commitment hearing, it is evident that only a recent examination would have any relevance to determining whether a person is mentally ill and at that moment either dangerous or gravely disabled. Thus, the statute pertaining to a petition for temporary commitment requires a physician's statement based on examination within the past 30 days. IC 16-14-9.1-8(c)(1). Such a statement was submitted in the instant action by Dr. Roegner, although he did not appear or testify at the February 3 hearing. The testimony of Dr. Reyes, by contrast, was evidently based on much earlier and thus less probative observations.[5] He stated that F.J.'s parents came to him some eight to ten months prior to the hearing, and that "sometime" thereafter he took F.J. with him on hospital rounds. Although the exact time period of Dr. Reyes' impressions is not clear, his testimony is replete with references such as the following, from which it may be inferred his opinion was not based on current observations:
"[I]f it were not for my closeness to all of you, the three of you [F.J. and her parents], I cannot even make an impression. If I didn't take you to the hospital with me continuously I couldn't have made a good impression of what is going on... . I took [her] ... with me to the hospital and then later on, Your Honor, the second time around she disappeared, she went to Florida, and went back three or four months, and came back, she visited me in the office, ... ."
We do not believe such qualified, indecisive and untimely testimony of a family friend of F.J. and her parents, even though it is the testimony of a physician and supported by his conclusion that, as a physical fact, F.J. was perhaps 20 pounds underweight, *379 will support the court's conclusion that she was either mentally ill or gravely disabled. Nor is such defect cured by the corroborative testimony of another witness, Mrs. Rusie, that F.J. laughed and responded to questions inappropriately.
In viewing such evidence we are mindful the appropriate constitutional standard is not, as F.J. has contended, whether she was shown "beyond a reasonable doubt" to be mentally ill and gravely disabled.[6] That standard has been rejected by the United States Supreme Court where civil commitments are concerned in a case analogous to the one at bar involving commitment for an indefinite period to a state mental hospital based on a showing of mental illness and a need for hospitalization of the individual "for his own welfare and protection or the protection of others, ... ." Addington v. Texas, (1979) 441 U.S. 418, 420, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323. In that case, the Court determined that although the "preponderance of the evidence" standard is constitutionally inadequate for examining the sufficiency of evidence in such a commitment, due process does not go so far as to require that the reasonable doubt test be employed. Addington held the evidence in favor of commitment must, in order to pass constitutional muster, be "clear and convincing", a test which arguably was met on the facts there presented though the United States Supreme Court left it to the Texas Supreme Court to determine the precise burden equal to or greater than "clear and convincing" evidence. By contrast, we believe in the instant case there was no testimony even approaching clear and convincing evidence against F.J., a conclusion we may reach without improperly weighing on appeal the evidence presented to the trial court.
Moreover, we believe the language of IC 16-14-9.1-7(e)(3)[7] requiring testimony of a physician who has "personally examined" the individual alleged to be mentally ill and dangerous or gravely disabled anticipates the considered diagnosis and prognosis of a physician made in his professional capacity for the purpose of determining mental illness, and whether, as a result of such illness, a person is dangerous or gravely disabled, and not, as in the case of Dr. Reyes' testimony, the more casual observations of a family friend and physician who is not *380 specifically engaged for that purpose.[8] Indeed we find it difficult to conceive of a situation where "clear and convincing" evidence in support of a commitment would be present absent the opinion of a qualified professional based on a proper examination.[9]See Addington v. Texas, supra at 429, 99 S.Ct. at 1811 where the Court stated "[w]hether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists. [Emphasis in original]" We believe the instant case demonstrates the danger of relying on the evidence of a witness who, although a physician, is untrained in the study of mental illness and unable as acknowledged by his own testimony to arrive at a psychiatric diagnosis.
The evidence presented at the hearing was insufficient to support the trial court's initial 90-day commitment.

THE COMMITMENT EXTENSION
We next consider F.J.'s argument that the statutory standard for commitment applied in this case[9] requiring a showing of mental illness and grave disability or dangerousness, is unconstitutional because it is vague and overbroad. Although she raises such argument with respect to both her temporary commitment and the subsequent extension for 60 days on May 18, 1977, we consider this issue only in the context of the commitment extension, since we have previously determined herein that her initial temporary commitment was unlawful.
We first note the statutory authority for extension of temporary commitments, expressed in IC 16-14-9.1-9(i) as follows:
"(i) Prior to the end of the period of temporary commitment, proceedings for an extension of the temporary commitment for one [1] additional period not to exceed ninety [90] days may be initiated by the filing with the court of a report by the attending physician or superintendent which states that the patient continues to be mentally ill and either dangerous or gravely disabled and in need of continuing custody, care or treatment in the facility for an additional period not to exceed ninety [90] days. Upon receipt of the report, if continuing custody, care or treatment is recommended, the court shall enter an order setting a hearing on the report, which hearing must be prior to the end of the current commitment period. Notice of the hearing shall be given to the patient and all other interested persons at least five [5] days prior to the hearing date, excluding Saturdays, Sundays, and legal holidays. Patient rights and hearing procedures are the same as those provided in subsections (e) and (f). [These sections set out the patient's rights in a original temporary commitment, discussed infra] If at the completion of the hearing and the consideration of the record the patient is found to be:
(1) mentally ill and either gravely disabled or dangerous; and
(2) in need of continuing custody, care or treatment in the facility; the court *381 may order the patient's continuing custody, care or treatment in the facility for one [1] additional period not to exceed ninety [90] days.
F.J. initially contends such statute violates the Fourteenth Amendment to the United States Constitution, and Article I, Section 12 of the Indiana Constitution because it gives the trial court too much discretion, and gives too little notice to affected individuals in failing to require, either "explicitly or implicitly," that a finding of grave disability or dangerousness be based on evidence of a "recent overt act" demonstrating such condition.
In this context our analysis again observes the statutory definitions of "mentally ill" and "gravely disabled" expressed in IC 16-14-9.1-1 as follows:
"(a) `Mental illness' means a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function. For the purpose of this chapter [16-14-9.1-1 - 16-14-9.1-18], `mental illness' may include, but shall not be limited to, any mental retardation, epilepsy, alcoholism, or addiction to narcotics or dangerous drugs.
(b) `Gravely disabled' means a condition in which a person as a result of a mental illness is in danger of coming to harm because of his inability to provide for his food, clothing, shelter, or other essential human needs.
(c) `Dangerous' means a condition in which a person as a result of mental illness presents a substantial risk that he will harm himself or others."
At least when viewed in light of these statutory definitions, we do not believe the language of IC 16-14-9.1-9(i) is any less precise-and indeed may be more precise than the implicitly approved language of the Texas statute in Addington v. Texas, supra, which required a determination of
"`(1) whether the proposed patient is mentally ill, and if so
(2) whether he requires hospitalization in a mental hospital for his own welfare or for the protection of others, and if so
(3) whether he is mentally incompetent.'"
Addington v. Texas, supra at 420, 99 S.Ct. at 1806 quoting Tex. Mental Health Code Ann. Art. 5547-51 (Vernon 1958). Texas law defines a mentally ill person as "a person whose mental health is substantially impaired," and further states a mentally incompetent person "means a mentally ill person whose mental illness renders him incapable of caring for himself and managing his property and financial affairs." Tex. Mental Health Code Ann. Art. 5547-4(k), (l). Since our statute requires not only a determination of mental illness, but also that because of such illness the person presents a "substantial risk" he will harm himself or others or is in danger of coming to harm because of his "inability" to provide for essential needs, we believe such statute adequately restrains the discretion of a court in enforcing the law and provides sufficient warning to a potentially affected person that he is subject to involuntary hospitalization. See In re Beverly, (1977) Fla., 342 So.2d 481, 97 A.L.R.3d 767, where the court upheld the constitutionality of a statute permitting involuntary commitment if a person is "[l]ikely to injure himself or others if allowed to remain at liberty" or "[i]n need of care or treatment and lacks sufficient capacity to make a reasonable application on his own behalf." Id. at 483, 769.
Those cases cited by F.J. requiring some evidence of actual or threatened harm to sustain a commitment determination do not stand for the proposition that a statute such as ours is constitutionally inadequate on its face. Moreover, since F.J. has not attacked the sufficiency of the evidence at her second commitment hearing, and indeed has not submitted the transcript of those proceedings to this Court on appeal, we need not consider the precise proof necessary to provide "clear and convincing" evidence under our statute. We simply note in this context that other courts have observed, in applying the "clear and convincing" standard, that a commitment may be upheld "where there was a reasonable expectation *382 that the respondent would engage in dangerous conduct," In re Powell, (1980) 85 Ill. App.3d 877, 880, 41 Ill.Dec. 160, 162, 407 N.E.2d 658, 660, and that such a commitment in the absence of evidence of prior harmful conduct is not an unlawful preventive detention based on the patient's status as a mentally ill person. People v. Sansone, (1974) 18 Ill. App.3d 315, 309 N.E.2d 733.
We thus conclude the language of IC 16-14-9.1-9(i), supra, is not unconstitutionally vague or overbroad for this first reason alleged by F.J. She further suggests, however, in attacking the extension of her commitment, that the failure of our commitment statute to "require a demonstration of incapacity to choose between treatment and liberty" renders it unconstitutional in violation of the First and Fourteenth amendments to the United States Constitution and corresponding provisions of the Indiana Constitution.
We disagree, and again conclude there was no error because our statute does not contain, at least on its face, the particular defect alleged by F.J. She apparently contends that because a civil commitment based on grave disability is an exercise of the State's parens patriae authority, as opposed to its police power, such commitments presume an incapacity to manage one's affairs resembling legal incompetence, and are valid only under a statute requiring a showing of incapacity to choose between liberty and treatment. Assuming arguendo the merits of such argument, we first observe that the extension of F.J.'s commitment, pursuant to an order in which the court found her in need of further treatment for up to 60 days, was supported by Dr. Moore's petition which alleged she was both gravely disabled and dangerous. It thus need not be assumed such extension was authorized merely by the parens patriae power of the State to protect the well being of residents incapable of providing for themselves. Moreover, we believe that under the language IC 16-14-9.1-1, supra, defining a "gravely disabled" person in part as someone who, because of a mental illness, is unable to provide for her essential needs, the statute generally implies an incapacity to meaningfully choose between treatment and liberty, assuming a person in the described condition is in reality able to experience liberty in light of his or her debilitating illness. See generally Addington v. Texas, supra. The cases cited by F.J. such as Lynch v. Baxley, (M.D.Ala. 1974), 386 F. Supp. 378, requiring an evidentiary showing of incapacity to choose, do not support the proposition such a statute is unconstitutional on its face. Although this Court agrees that not "every" mental illness renders a person incapable of choosing between liberty and treatment, we do observe that under our statute in addition to such mental illness, and because of it, the allegedly ill person must also be shown to be "dangerous" or "gravely disabled". In the instant case, F.J. presents no argument concerning the evidence in favor of extending her commitment and indeed has not forwarded the record of those proceedings to this Court. Thus, we need not address the constitutionality of the manner in which the statute was applied against her. It follows that no constitutional defect in the commitment extension has been shown.
Since we have previously determined, pursuant to Addington v. Texas, supra, that the commitment statute need not require proof beyond a reasonable doubt of mental illness and dangerousness or grave disability, and since F.J. raises no other arguments regarding the 60-day extension of her involuntary commitment, it follows the trial court's order involving that extension must stand.[10]

*383 ALLEGED PROCEDURAL IRREGULARITIES
We further pause to consider, without having to decide the issues thus raised, some of the numerous procedural irregularities apparent in the record, discussion of which we believe would facilitate future commitments of this nature.
As this opinion has earlier noted, the statutory method for civilly committing persons in Indiana was designed to afford numerous procedural protections, among them the following provisions of IC 16-14-9.1-9:
"(d) The person alleged to be mentally ill, the petitioner(s) and all other interested persons shall be given the opportunity to appear at the hearing and to testify. The petitioner(s) and the person alleged to be mentally ill may present and cross-examine witnesses. The court may receive the testimony of any other person.
(e) The person alleged to be mentally ill has the right:
(1) to receive adequate notice of the hearing so that he or his attorneys can prepare for the hearing;
(2) to receive a copy of the petition or order;
(3) to be present at the hearing, subject to the court's right to remove him if he is disruptive to the proceedings or the court's right to waive his presence at the hearing if it would be injurious to his mental health or well-being; and
(4) to be represented by counsel.
(f) The petitioner(s) or the person alleged to be mentally ill has the right to a change of judge, but not to a change of venue from the county."
We first observe that although this statute nowhere expressly provides a person subject to civil commitment must be timely and personally informed of such rights in the notice for his hearing, prior to the hearing, or at any time during the proceedings, the facts of the instant case reveal the hazards of procedural fairness which may result where even though timely notice of the hearing is given, the alleged mentally ill person is not fully and fairly apprised of his statutory rights.
This precise issue was addressed in the recent case of Vitek v. Jones, (1980) 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552, where a Nebraska prisoner was afforded constitutional procedural protections when he was transferred involuntarily to a state mental hospital for treatment of a mental disease. The United States District Court for the District of Nebraska had specified the following minimal procedures which the state was required to observe before he was transferred to the mental hospital:
"A. Written notice to the prisoner that a transfer to a mental hospital is being considered;
"B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;
"C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;
"D. An independent decisionmaker;
"E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;
"F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; and
"G. Effective and timely notice of all the foregoing rights." (Emphasis added)
Id. 100 S.Ct. at 1264, quoting Miller v. Vitek, (D.Neb. 1977) 437 F. Supp. 569, 575. The Supreme Court deemed these minimum procedures in such a case involving commitment of someone who is already involuntarily in custody,[11] to be "appropriate", stating as follows:

*384 "Because prisoners facing involuntary transfer to a mental hospital are threatened with immediate deprivation of liberty interests they are currently enjoying and because of the inherent risk of a mistaken transfer, the District Court properly determined that procedures similar to those required by the court in Morrissey v. Brewer, supra, [(1972) 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, a parole revocation situation] were appropriate in the circumstances present here.
The notice requirement imposed by the District Court no more than recognizes that notice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him. Wolff v. McDonnell, (1974) 418 U.S. 539, at 564, 94 S.Ct. 2963, at 2978, 41 L.Ed.2d 935. Furthermore, in view of the nature of the determinations that must accompany the transfer to a mental hospital, we think each of the elements of the hearing specified by the District Court was appropriate."
Vitek v. Jones, supra 100 S.Ct. at 1265.
Returning to the case before us, the record reveals F.J. was generally advised, at the hearing, of her right to testify in her own behalf. It is also apparent, however, that the notice she received of her February 4 hearing was ineffective to give her or her attorney adequate opportunity to prepare for such hearing. In particular, such notice, which the record shows was merely read to her on the day of the hearing itself, informed her an "application for suit and support money" would be heard at 10 a.m. that day. It was apparently a form notice used in dissolution of marriage proceedings, and clearly not effective notice of a hearing on commitment for mental illness. Moreover, despite the fact F.J. was apparently then in custody, such notice was not served on "the superintendent or the chief executive officer of a facility having care or custody of the person," as required by IC 16-14-9.1-9(b). See also Ind. Rules of Procedure, Trial Rules 4.2(B), 4.3. Nor does it appear F.J. received any copy of her parents' petition herself as required by IC 16-14-9.1-9(e)(2), though she acknowledged at the hearing that she had read a copy of it.
Additionally, although the record does not disclose exactly how F.J. was enabled to appear at the February 4 hearing, we note in this context that under a statute permitting a purportedly mentally ill person to be present at a commitment hearing, mere notice of the hearing may be inadequate where that party is being legally detained in another's custody, since a court order would be required to allow him or her to be personally present. North v. State, (1980) Ind. App., 406 N.E.2d 657, 662 (notice was given to the attorney of an incarcerated defendant, but there was no order for the defendant to be present, concerning a hearing at which he would either be sentenced or committed as a criminal sexual deviant.)
Although a considerable part of the record of F.J.'s February 4 hearing was directed to her right to legal representation, we deem the comments made to her to have been largely misinformation and confusing, and thus not an "effective" advisement within the meaning of Vitek v. Jones, supra. Thus, F.J. was at no time told she could have an attorney appointed for her, despite the language of IC 16-14-9.1-9(e)(4) giving her the right to be represented by counsel. See also Vitek v. Jones, supra. Indeed, she was informed by Grund on the morning of February 4, prior to the evidentiary part of the hearing that afternoon, that she would have to pay for her own attorney if she wanted one, and was at the same time given the following confusing *385 information by the trial judge in response to a question from a public health nurse:
"MRS. HARTLEROAD: Your Honor, does it make a difference whether she has the money to afford an attorney or not, can she pick one of her choosing?
BY THE COURT: Well, that's up to the attorney who represents her."
The trial judge proceeded to inform F.J. of her right to counsel in the following manner:
"BY THE COURT: Today we are having a hearing to make a determination whether or not you should be committed. That is our purpose here today, to answer the question why if at all. Now, you are entitled to be represented by an attorney of your choice should you choose. Mr. Grund is the Prosecuting Attorney for Miami County and does represent the persons who are there has been a petition filed but should you choose to have an attorney of your-
F.J.: I didn't understand that. [A difficulty shared by this Court.]
BY THE COURT: You did not understand that?
F.J.: No.
BY THE COURT: Should you wish you may have an attorney of your own choosing, do you wish
F.J.: May I ask the purpose of the Prosecuting Attorney?
GRUND: She wants to know the purpose of the Prosecutor appearing.
BY THE COURT: I've often wondered.
F.J.: Well, I know that, but who does he represent, he defends the persons being prosecuted.
BY THE COURT: No, he defends the State of Indiana.
F.J.: Oh.
BY THE COURT: He represents the State of Indiana.
F.J.: Oh. But he, in other words, he is not a personal attorney?
BY THE COURT: He is your personal attorney in this matter. [Emphasis added]"
Significantly, Grund was also recommended by the court to F.J. as someone very capable to represent her, as revealed by the following additional colloquy that morning:
"BY THE COURT: Mr. Grund is very capable to represent you.
GRUND: Thank you Your Honor.
BY THE COURT: He is a very competent attorney and would do a very good job.
F.J.: At this moment, for this day in Court, do you think he is capable of defending me.
BY THE COURT: Absolutely.
F.J.: Pardon me?
BY THE COURT: Absolutely."
Moreover, as is perhaps evidenced by the trial judge's comment that Grund "is ... [F.J.'s] personal attorney in this matter," F.J. was also misinformed that Grund had some official capacity where involuntary civil commitments are concerned. We find no statute creating such authority in the office of the prosecuting attorney.[12] Thus, when the evidentiary part of the hearing commenced on the afternoon of February 4, the following exchange occurred:
"BY THE COURT: I notice that you are accompanied by Mr. James H. Grund, *386 who is the Deputy Prosecutor, is he appearing here in his capacity as Deputy Prosecutor or as your privately employed attorney.
F.J.: I didn't understand all that.
J.H. GRUND: Your Honor, I'm appearing as her counsel due to the fact that I am Deputy Prosecutor, not that I'm privately employed."
We believe the above demonstrates our conclusion that F.J. was misinformed as to her right to counsel.
We next note in the record that although IC 16-14-9.1-9(f) provides a person alleged to be mentally ill has the right to a change of judge, F.J. was at no time advised of such right despite the fact the judge at her hearing had determined only a few days earlier she should be detained on an emergency basis because she was mentally ill and dangerous, and despite conversations between F.J. and that judge prior to trial concerning the merits of her case.[13] It is significant in this regard that during the course of F.J.'s hearing, which was conducted by the trial judge because F.J.'s parents were unrepresented by counsel, the following colloquy occurred:
"F.J.: I'd just like to go on and say legally, you know, there is nothing that can keep me in the hospital.
BY THE COURT: I can.
F.J.: No, you can't.
BY THE COURT: You want to see. Would you like to test your theory.
F.J.: I don't trust-
BY THE COURT: In other words, you say I can't do it, I'm just telling you I think I can and if you want to find out whether I can or can't-"
In viewing this exchange, as well as the procedural irregularities discussed above, we believe that where someone such as F.J. is already in custody and then temporarily committed, only a careful adherence to the protective measures of IC 16-14-9.1-9(d), (e), (f), combined with effective and timely notice of such rights, including her right to a change of judge, as expressed in the reasoning of Vitek v. Jones, supra, will afford the substantial protection necessary to guard against any unwarranted deprivation of liberty of an allegedly mentally ill individual.
Of course it is also evident, in addition, that any other statutory requirements must also be met. As noted earlier, this was not done in the case of F.J., since-although her commitment was evidently commenced by her parents' petition pursuant to IC 16-14-9.1-8(c) she was improperly informed by the trial judge that the hearing must be within 10 days of the notice of the hearing, even though the appropriate statute provides the hearing date may not be less than 10 days from the notice. IC 16-14-9.1-9(b). It is only when a superintendent's probable cause report, as opposed to a third-party petition, initiates the proceedings that a hearing date "may not be later than" 10 days from an appropriate court order.[14] In *387 the instant case, it is apparent F.J. may have been prejudiced by such misinformation, since she had at most only a few hours to consult with an attorney in between the morning and afternoon proceedings on February 4, which was the day she was notified of her parents' petition. Moreover, such early hearing did not include the testimony of any examining physician selected by F.J., although she had indicated that morning that she would be interested in such an examination and the trial judge at that time remarked "I can't imagine her [F.J.] ... wanting to come to trial without having her re-examined by a physician."[15] In light of our determination that F.J.'s initial commitment was not supported by sufficient evidence, in addition to the many irregularities of her first hearing, we accordingly reverse in part and affirm in part the determination of the trial court.
YOUNG, P.J., concurs.
CHIPMAN, J., concurs in result.
NOTES
[1] IC 16-14-9.1-7 provides in part:

"Emergency detention.  A person may be detained in a psychiatric hospital or center for a period not exceeding seventy-two [72] hours, excluding Saturdays, and legal holidays, as follows:
(a) Written application must be made to a hospital or center by a health or police officer or other individual. The application must:
(1) state the applicant's belief that the person is mentally ill and dangerous and in need of immediate restraint; and
(2) contain a written statement by at least one [1] physician that, based on an examination or based on information given him, the person may be mentally ill and dangerous." (Emphasis added)
[2] It appears Dr. Reyes in submitting his statement, which was made without specifying his medical speciality, if any, filled out both parts of a form physician's statement, one of which stated his opinion F.J. was mentally ill and dangerous based on information supplied to him, and the other that he had examined F.J. and thereby concluded, among other things, that she might endanger someone's life on the road. This was the only direct reference to danger to F.J. herself or to others, and Dr. Reyes made no mention based on his personal examination that she was mentally ill.
[3] Such early hearing date was in violation of IC 16-14-9.1-9(b), which provides "[t]he hearing date may not be less than ten [10] days from the date of notice, excluding Saturdays, Sundays, and legal holidays." This particular procedural irregularity was not raised by F.J.
[4] The record does not reveal the outcome on Dr. Moore's recommendation for a regular commitment of F.J. Although the State has informed this Court, in connection with a motion to dismiss, that F.J. ultimately was released from custody, it is unclear whether that release was from a regular commitment pursuant to Dr. Moore's recommendation, or from the extension of her temporary commitment considered herein.
[5] We note Dr. Reyes did not refer in his testimony to any examination of F.J. in connection with her emergency detention on January 26, although a physician's statement filed in that action recites that such an examination was made (see not 8 infra). It appears his testimony in this regard was not typical of psychiatric expert testimony generally, in that it did not include a foundation revealing Dr. Reyes' particular qualifications or the date and nature of any examination, nor did it disclose his specific conclusions and reasoning as to mental illness and dangerousness or disability of F.J.
[6] Although F.J. has contended a "reasonable doubt" standard is required by Article I, Section 12 of the Indiana Constitution, as well as by the Fourteenth Amendment of the U.S. Constitution, we do not believe she cogently argues such question, since she cites no Indiana authority on this issue and presents no argument why the Indiana Constitution requires a different result from that reached under the U.S. Constitution. It follows her argument in this regard has been waived. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).
[7] The provisions of IC 16-14-9.1-7 deal generally with emergency detention and the procedures for a temporary commitment which may follow such detention, including the following requirement imposed in subsection (e)(3):

"At the final hearing, no person may be found in need of temporary commitment unless at least one [1] physician who has personally examined the person testifies at the hearing. This testimony may be waived by the person if the waiver is voluntarily and knowingly given." (Emphasis added)
That provision-which is expressed with respect to commitments triggered by a superintendent's probable cause report where there has been a previous emergency detention is nowhere repeated in IC 16-14-9.1-9, the statute prescribing the general requirements for temporary commitment hearings. Further, the same requirement of a testifying physician exists where a voluntary patient seeks discharge and a superintendent or attending physician states there is probable cause to believe such patient is mentally ill and dangerous or gravely disabled and in need of temporary commitment. IC 16-14-9.1-2(b). These three statutes involve involuntary civil commitments which are essentially identical except for the manner in which they are commenced. Were we to read such statutes independently, the result, of course, would be that a different evidentiary showing would be statutorily required at different types of commitment hearings under the three initiating procedures of IC 16-14-9.1-8. It is evident, however, these statutory provisions should be read together to require an examining physician's testimony or a proper waiver of such testimony even at a hearing commenced as in the instant case, by a third party petition. In the instant case we find it unnecessary to consider under what circumstances waiver by an allegedly mentally ill person could be "voluntary".
[8] In reaching such conclusion we are cognizant it was apparently the same Dr. Reyes who signed an unsworn physician's statement for F.J.'s earlier emergency detention which stated he had examined her on January 26. Even assuming we were entitled to consider such evidence outside the record of the February 4 commitment hearing, we do not believe such assertion-in which Dr. Reyes reported he believed F.J. might endanger someone if she drove, but did not state he had found her to be "mentally ill" based on his examination (see note 2 supra)-is conclusive where the evidence reveals his testimony was not based on a proper examination, but rather on his casual observations as a family friend.
[9] As observed earlier, the petition filed by F.J.'s parents seeking her temporary commitment alleged she was mentally ill and may come to harm because she could not provide for her essential needs, and the trial court determined on February 4 she was mentally ill and gravely disabled. Dr. Moore's later petition for extension of such commitment stated F.J. was mentally ill, dangerous and gravely disabled. By an order following a hearing on May 18, 1977, the earlier commitment was extended because "such an extension is in the best interest" of F.J. and because the court found she was "in need of further observation, diagnosis, care and treatment... ."
[10] Our conclusion in this regard acknowledges the apparent independence of the commitment extension from the earlier 90-day temporary commitment, since such extension was, pursuant to the appropriate statute, initiated by its own petition and ordered only after a new hearing which, since F.J. raises no additional error, was apparently conducted with the appropriate procedural protections. We thus need not consider whether the commitment extension was in any respect tainted by procedural or other irregularities occurring at the February 4 hearing on temporary commitment.
[11] In this respect we find little distinction to be drawn between the commitment procedural rights afforded an incarcerated criminal in Vitek v. Jones and those which should be observed for someone already subject to involuntary emergency detention for mental illness as in the case of F.J.

Effective October 1, 1980, our statutes also provide that protections similar to those in Vitek, including notice of such rights, must be afforded to criminal offenders who are involuntarily transferred from the department of correction to the department of mental health or a mental health facility. Ind. Code 11-10-4-3(a)(3).
[12] Although our statutes once provided it was the duty of the prosecuting attorney to appear for the person alleged to be incompetent in guardianship proceedings pursuant to Ind. Code 29-1-18-19, such provision was omitted in the 1971 amendments to that section. We believe there may at least be an improper appearance of a conflict of interest if a prosecuting attorney represents, as in the instant case, an allegedly mentally ill person subject to commitment to a state facility, since it is the duty of a prosecuting attorney to generally "prosecute the pleas of the state." Ind. Code 33-14-1-1. Although we acknowledge it is generally the attorney general who represents the state in actions such as the one at bar, we do observe that at the time of F.J.'s commitment it was the duty of the prosecuting attorney, pursuant to Ind. Code 35-5-2-5, to file a petition for regular or temporary commitment of an individual who has been found not responsible for the commission of a crime by reason of insanity.
[13] There was an indication by F.J. that a month before the February 4 hearing she telephoned the trial judge concerning an examination of her father, apparently to determine his mental condition. During the course of the hearing the judge recited the advice he had given F.J., which was to file an appropriate petition. Moreover, the record shows that prior to the presentation of evidence, when F.J. was unrepresented by counsel, she discussed the merits of her case with the judge, who told her "your rambling on like this gives me reason to believe they [F.J.'s parents] may be correct" regarding her mental capacity.
[14] Indeed, it is provided in IC 16-14-9.1-7(e) that a court must act upon a probable cause report within 24 hours, and should hold a final hearing where appropriate within two days of the court's order for such hearing. Although it does not appear F.J.'s commitment was commenced under this procedure, we do observe-in response to her argument such statute provides inadequate notice of a hearing-that the two-day language may be merely directory, see generally Allen County Department of Public Welfare v. Ball Memorial Hospital, (1969) 253 Ind. 179, 252 N.E.2d 424, anticipating only that a person subject to emergency detention will be brought before the court in a subsequent action for temporary commitment within two days. The statutory procedure anticipates continuances in appropriate cases, IC 16-14-9.1-9(c), and in any event requires, as noted above, that in all cases a person alleged to be mentally ill has the right to receive adequate notice of the hearing "so that he or his attorneys can prepare for the hearing." IC 16-14-9.1-9(e)(1). (Emphasis added).
[15] In considering the timing of a hearing on involuntary commitments, we also observe that whenever a person is, like F.J., subject to emergency detention and actual treatment, it may be argued that drugs or other such treatments might themselves impair that individual's ability to understand his rights or effectively participate in his defense. In order to forestall any issue in this regard, we believe it is advisable for a court to advise itself at each appropriate state of the commitment process concerning the nature and effect of any such treatments which are administered.