IN THE MATTER OF THE COMMITMENT OF JAMES L. BINKLEY

[No. 1-577A114. Filed November 13, 1978. Rehearing denied December 14, 1978. Transfer denied April 4, 1979.]

*Ted R. Todd, Todd, Hocker & Walro,* of Madison, for appellant.

*Curtis M. Jacobs, Cooper, Cox, Jacobs & Kemper,* of Madison, for appellee.

ROBERTSON, J. — The respondent-appellant Binkley is appealing from the trial court's order committing him to the Madison State Hospital. Of the several issues presented none raise reversible error.

The first issue raised is whether the Jefferson Circuit Court erred when it denied Binkley's motion to dismiss which was predicated upon an alleged lack of jurisdiction by that court. The facts relevant to this issue show that Binkley was arrested in Bloomington, Indiana, on the 8th of December, 1976. He was taken to Madison State Hospital two days later as a result of an order for emergency detention issued by the Monroe Circuit Court. On the 27th of December, the Monroe Circuit Court dismissed the petition for emergency commitment because of the failure to comply with the time constraints required by Ind. Code 16-14-9.1-7(e)(2); however, on the same date a petition for emergency detention was filed by authorities of the Madison State Hospital with the Jefferson Circuit Court in Madison. Binkley was served with the

appropriate notice, and a hearing for temporary commitment was held resulting in this appeal.

IC 16-14-9.1-5 grants jurisdiction for commitment proceedings to Indiana courts having probate jurisdiction. There can be no doubt that subject matter jurisdiction rested in the Jefferson Circuit Court.

IC 16-14-9.1-8(c) provides in pertinent part for the commencement of commitment proceedings:

(c) by the filing with a court having jurisdiction in the county of residence of the person or in the county where the person may be found of a written petition by a health or police officer or friend, relative, spouse, or guardian of the person, or the superintendent of any appropriate facility where the person may be found.

Binkley's theory of lack of jurisdiction rests, it seems, upon the involuntary manner by which he reached Jefferson County. However, the facts clearly show that personal jurisdiction was obtained pursuant to the above quoted statutory provision regardless of the abortive commitment procedure from the Monroe Circuit Court. We believe the legislative inclusion of the phrase "where the person may be found" to be an obvious effort to facilitate treatment, when needed, without the court being hampered by the more traditional concepts of residence or domicile.

Binkley next argues that the notice served upon him relating to the hearing for temporary commitment was violative of federal and state constitutional due process standards because it failed to provide a factual basis for his detention; it did not state the standard upon which he may be detained; and, it did not set forth the names of the witnesses to be used against him. The notice Binkley received was a written form notice which set forth, among other things, the time, place, and purpose of the hearing. (Binkley sought and received a two week continuance from the hearing as originally set by the Jefferson Circuit Court.)

For the reasons asserted we do not find the notice to be constitutionally deficient from the standpoint of due process. The primary purpose of notice to a defendant, or a respondent as in this case, is to inform as to the nature of the action and to have a reasonable opportunity to make a defense. If these objectives are fulfilled,

the notice comports with due process standards. *State ex rel. Red Dragon Diner v. Superior Court of Marion County* (1959), 239 Ind. 384, 158 N.E.2d 164. Therefore, we are of the opinion that the notice of hearing in this case passed the due process muster. As an aside, and without so holding, it may be a fair assumption that the Rules of Trial Procedure provide a remedy for most of the alleged deficiencies ascribed to the notice of hearing in this appeal.

Binkley also asserts a constitutional deficiency of vagueness in the definition of "gravely disabled," IC 16-14-9.1-1(b), as it relates to the definition of "dangerous" set forth in IC 16-14-9.1-1(c).[1] While this issue is eligible to be waived for noncompliance with Appellate Rule 8.3(A), we feel nonetheless, that the applicable statutes when read as a whole do not present any question of being vague or overbroad, because

> [a] statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it to adequately inform them of the conduct to be proscribed.

*Platt v. State* (1976), 168 Ind.App. 55, 341 N.E.2d 219, 221.

The next issue raises the question of the proper standard of proof to be applied by the trial court in making its determination to commit a person alleged to be mentally ill. Binkley asserts that because his personal liberty is at stake the burden of proof should be that of beyond a reasonable doubt, not unlike criminal or juvenile proceedings. In support of his argument Binkley cites such allegorical authorities as *In re Gault* (1966), 387 U.S. 1, and *In re Winship* (1970), 397 U.S. 358. Binkley also directs us to a number of direct cases, especially the well-written and persuasive case of *In re Ballay* (D.C. Cir. 1973), 482 F.2d 648, which requires proof beyond a reasonable doubt of mental illness as a due process requirement in commitment proceedings.

---

1. IC 16-14-9.1-1 Definitions

. . .

(b) 'Gravely disabled' means a condition in which a person as a result of a mental illness is in danger of coming to harm because of his inability to provide for his food, clothing, shelter, or other essential human needs.

(c) 'Dangerous' means a condition in which a person as a result of mental illness presents a substantial risk that he will harm himself or others.

The appellees (Binkley's father and the State) in a like manner direct us to numerous cases from other jurisdictions which hold that a lesser standard of proof, either clear and convincing or a preponderance of the evidence, is sufficient to commit a person found to be mentally ill. For the following reasons we agree with the latter position.

In weighing the respective arguments of both sides of the question and examining the authorities tendered for our consideration, it is our opinion that a commitment proceeding pursuant to IC 16-14-9.1 *et seq.* is neither fish nor fowl when compared to traditional criminal or civil proceedings but, instead, is a hybrid of the two, as noted in *Matter of Valdez* (1975), 88 N.M. 338, 341, 540 P.2d 818, 821.

In reaching our decision, we believe it proper to note that IC 16-14-9.1-13 states that judicial proceedings held pursuant to Chapter 9.1 shall be conducted as other civil proceedings according to the Indiana Rules of Trial Procedure. While both the rules of trial procedure and the applicable commitment statutes do not, in so many words, state the standard of proof to be borne by the moving party, we are of the opinion that the language of IC 16-14-9.1-13 sets the tone in which the courts shall treat commitment proceedings. It is law of long standing that:

> The general rule in civil cases is, that a party having the burden of an issue shall succeed upon that issue if he can bring to his aid a preponderance of the evidence.

*Hale v. Matthews* (1888), 118 Ind. 527, 530, 21 N.E. 43, 44.

Or, as defined in the Indiana Pattern Jury Instruction 7.01, the trier of fact must be convinced from a consideration of all the evidence that the issue in which a party having the burden is more probably true than not true.

In our holding that a preponderance of the evidence will suffice in a proceeding held pursuant to IC 16-14-9.1-7, there is no intention on our part to deprecate the vigorous and sincere argument presented by the appellant Binkley. The loss of personal liberty is indeed a serious matter for the indivdiual involved. However, IC 16-14-9.1-9, pertaining to temporary commitments, sets forth specific rights for the person alleg-

ed to be mentally ill. These rights, along with the habeas corpus provisions (IC 16-14-9.1-14), should serve to protect a person from vindictive, malicious, or other improper uses of the commitment process. Additionally, continual psychiatric and judicial review, as required by the appropriate statutes, provide for release at the earliest possible time for the person committed for treatment of mental illness.

The contentions raised by Binkley have been considered and decided, correctly we believe, in the recent case of *State v. Turner* (Tex. 1977), 556 S.W. 563, *cert. denied.* That case states:

> We see several distinctions between civil commitment proceedings and criminal proceedings which justify the lesser standard. The involuntary mental patient is entitled to treatment, to periodic and recurrent review of his mental condition, and to release at such time as he no longer presents a danger to himself or others. [. . .] *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974); *Donaldson v. O'Conner*, 493 F.2d 507 (5th Cir. 1974), *judgmt. vacated*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Note, *Right to Treatment*, 86 Harv.L.Rev. 1282 (1973). The mental patient's loss of liberty therefore is less severe than that suffered by the convicted criminal. In addition, there is a significant difference between the retrospective assessment of conduct made by a jury in a criminal case, and the determination of *future* conduct and *future* need made by a jury in a civil commitment. [. . .] If the deprivation of liberty inherent in the civil commitment process were held to mandate application of the highest standard of proof, the beyond a reasonable doubt standard, we feel that the State's ability to act as *parens patriae* for the mentally ill would be impaired. Medical science is not an exact art:
>
>> '[W]e disapprove the holding of . . . cases which require proof beyond a reasonable doubt. At this level of medical knowledge there may be many urgent cases in which it is impossible to exclude every reasonable doubt, and it appears that the likelihood of harm to individuals and society because of a standard of proof which makes commitment almost impossible greatly outweighs the likelihood of harm to the individual attributable to a less restrictive standard. Proof that is clear, cogent, and convincing is the highest standard of proof possible at the current state of the medical arts.' *State ex rel. Hawks v. Lazaro*, 202 S.E.2d 109, 126-27 (W.Va. 1974).

Due process does not require, *ipso facto*, the highest standard of

proof, even though personal liberty is at stake. The State, as *parens patriae* undertakes the beneficient task of treating the mentally ill, and under its police power protects the public from harm. These are valid, necessary state objectives which should not be thwarted by application of a too strict burden of proof. And the situation would be an unfortunate one should a person in need of care be deprived of aid because he is mentally incapable of knowing his needs and the medical profession can not meet a too strict burden. We agree with the Supreme Court of Florida that:

> 'The difficulty in proving an individual state of mind combined with a stringent reasonable doubt standard, may work a hardship on the individual who has a right to treatment and to society which has a right to protection.' *In re Beverly*, 342 So.2d 481, 488 (Fla. 1977).

556 S.W.2d at 566.

Lastly, Binkley argues that the evidence fails to show beyond a reasonable doubt that he was dangerous to himself. As we have previously stated, the trial court is not required to use that standard in determining whether to commit or not to commit Binkley. The question thus becomes one of sufficiency of the evidence to support the trial court's judgment based upon the facts adduced at Binkley's hearing.

We feel it appropriate to repeat the standard of appellate review as it relates to this issue:

> It is well-settled that as a reviewing court we will not weigh the evidence nor substitute judgment for that of the trial court merely for the reason that we might feel disposed to rule differently had this court the prerogative of weighing. Only where the evidence is without conflict and leads but to one reasonable conclusion, will the judgment be set aside on the ground that it is contrary to law.

*Johnson v. Taylor Bldg. Corp* (1978), Ind.App., 371 N.E.2d 404, 406.

The trial judge heard evidence that Binkley was a Phi Beta Kappa graduate of Indiana University and that he was a tennis player of some stature in the Big Ten. He also graduated in the upper fourth of his class from Indiana University Law School, and he had taken and passed the bar examination. Additionally, he attended medical school for a period of time. In the summer of 1969, Binkley left Indiana to go to

California where he stayed until returning to Bloomington during the summer of 1976. In 1971, he stopped communicating with his parents. Binkley's parents made five trips to California trying to locate him and were successful on two occasions. In early 1974, they found Binkley living beneath a highway overpass under conditions which could be described as squalid. An attempt to get him to return home or be committed for psychiatric care was unsuccessful. On the second occasion about two years later when he visited his parents at their motel room, Binkley did not divulge where he was living and his physical appearance was as bad, if not worse than on the first occasion. On one of these visits, Brinkley stood for about thirty hours talking with his parents. The conversation was characterized by Binkley's father as a rigamarole in that it was confused, meaningless, and trivial.

Binkley next appeared at his parents' home in June of 1976. The testimony showed that until the 8th of December, 1976, Binkley's lifestyle remained the same. He remained unkept and was wearing the same clothes his parents had observed in early 1974. He foraged for food in dumpsters behind various restaurants and food stores in Bloomington. A policeman described one occasion when he watched Binkley eat tomatoes, lettuce, and weiners that were, in the officer's words, "rotten." Binkley apparently stayed in a shelter house at Cascades Park for a period of time and then moved to an area behind fraternity row on North Jordan. There he constructed a tent of green plastic garbage bags with a cardboard and paper floor. A "tin can" stove was in the tent. On the 8th of December, 1976, the campus police kept a watch on Binkley because of the severely cold weather and their concern over his safety at being exposed to the elements. The police also described Binkley's conversations with them as "ambiguous." Binkley was arrested that night in order to get him to shelter and warmth. Additionally, there was psychiatric testimony that Binkley was suffering "schizophrenia, split personality manifested by social cultural withdrawal and lack of judgment, or impaired judgment, delusions and possible hallucinations, and impairment of his association of words, thinking, feeling and acting."

Even though there was other testimony which conflicted to some degree to the foregoing recital of the evidence, we are of the opinion

that there was sufficient evidence to support the trial judge's findings and order.[2]

Judgment affirmed.

Lybrook, P.J., and Lowdermilk, J., concur.

NOTE—Reported at 382 N.E.2d 952.

2. "The Court, after hearing and being advised in the premises, now finds that James L. Binkley has, for more than three months, been living out of doors and foraging for food in garbage receptacles.

The Court further finds James L. Binkley often has difficulty communicating.

The Court further finds that James L. Binkley suffers from schizophrenia, is mentally ill and dangerous to himself in that his conduct of living without shelter and foraging from garbage receptacles presents a substantial risk that he will harm himself.

The Court further finds that James L. Binkley is mentally ill and gravely disabled in that he is in danger of coming to harm because of his inability to provide for his food, clothing, shelter and other essential human needs for the reason that he lives out of doors without adequate shelter and forages for food in garbage receptacles.

The Court further finds that James L. Binkley should benefit from psychiatric care and treatment."