**Gale JONES, Appellant (Respondent),**

v.

**STATE of Indiana, Appellee (Petitioner).**

No. 2–784A206.

Court of Appeals of Indiana, Second District.

May 6, 1985.

Rehearing Denied Aug. 1, 1985.

Kenneth J. Falk, Lisa Cheatham, Legal Services Organization of Indiana, Inc., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Kenneth P. Williams, Deputy Atty. Gen., Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Respondent-appellant Gale Jones (Jones) appeals her involuntary commitment to Central State Hospital, claiming inadequate assistance of counsel, judicial bias stemming from the trial court's questioning of the petitioner, and insufficient evidence that she was either dangerous or gravely disabled.

We affirm.

## FACTS

Jones was committed to Central State Hospital on February 28, 1984 by order of the Marion County Municipal Court after a hearing conducted pursuant to Ind.Code 16–14–9.1–10 (Supp.1984). The court characterized the proceedings as a review hearing because Jones had previously been committed and released on outpatient status, apparently under the provisions of IC 16–14–9.1–19. Jones was detained on February 16, 1984 when her erratic behavior attracted the attention of the police.

As an outpatient, Jones received the drug Mellaril, a tranquilizer used in the treatment of a variety of mental illnesses. Sometime prior to her detention by the police, Jones quit reporting for outpatient treatment and refused to continue taking her medicine. She stated at her commitment hearing that the medicine made it impossible for her to perform simple tasks or to take care of three children in her former employment as a baby sitter. At the time of her hearing, Jones was unemployed and receiving state aid.

She appeared in person at the hearing and was represented by court appointed counsel, Terry Hay (Hay). The petitioner was Dr. Roger Jackson (Dr. Jackson), a staff psychiatrist at Wishard Hospital who had examined Jones after she was detained by police and taken to Wishard Hospital. He later supervised the resident physician who was primarily responsible for Jones's treatment. Dr. Jackson was also familiar with her condition because of examinations he conducted as part of previous treatment programs.

Dr. Jackson testified, without objection, that Jones was suffering from paranoid schizophrenia. He pointed to Jones's evasive answers and loose associations as symptoms of her mental disorder. In addition, he stated that Jones believed her thoughts were controlled or influenced by others and had ideas of reference (the belief that coincidental occurrences in the environment are caused by the subject's presence). Dr. Jackson also found Jones to be verbally aggressive and physically threatening. In fact, Jones had to be secluded while awaiting the commitment hearing because of an altercation with another patient. Dr. Jackson's prognosis for Jones, based on her refusal to continue taking medicine and her failure to respond to treatment, was poor. He concluded that the least restrictive environment appropriate for treating Jones was Central State Hospital.

Hay questioned Dr. Jackson about returning Jones to an outpatient treatment program. He also asked whether anyone had explained to Jones the necessity of taking medicine. During Hay's cross-examination of Dr. Jackson, Jones also directed questions to Dr. Jackson.

Jones testified that she felt well enough to be living and working on her own outside the hospital, "[a]s long as they don't

play the pressure." *Record* at 55. In response to questions by Hay, Jones also discussed her reluctance to take medicine and her belief that "[p]eople have tapped into me to know what I'm thinking." *Record* at 57. Jones did not call witnesses to testify on her behalf.

At the end of the proceeding, the trial court found Jones to be both dangerous and gravely disabled. Jones is now represented by counsel from the Legal Services Organization of Indiana in her appeal.

On appeal, she alleges that Hay failed to communicate or consult meaningfully with her before trial and, because of this, three witnesses were not called who would have testified that she was neither gravely disabled nor dangerous.

### ISSUES

Jones presents three issues for our consideration:

1. Whether appointed counsel committed errors at trial and represented Jones in such an ineffective manner that she was, in essence, denied her right to counsel?

2. Whether judicial bias, constituting fundamental error, arose from the trial court's questioning of Dr. Jackson?

3. Whether Jones's commitment was based on sufficient evidence that she was either dangerous or gravely disabled?

### DECISION

ISSUE ONE—Whether appointed counsel committed errors at trial and represented Jones in such an ineffective manner that she was, in essence, denied her right to counsel?

PARTIES' CONTENTIONS—Jones contends that she was denied her right to counsel because Hay made extraneous comments during cross-examination of Dr. Jackson; Hay failed to object to the testifying expert's lack of personal knowledge regarding Jones's condition; Hay failed to object to the trial court's examination of the petitioner; Hay failed to object to the narrative form of testimony given by petitioner; Hay failed to call three favorable witnesses as a result of his perfunctory consultation with Jones; and Hay improperly questioned Jones regarding her belief that others controlled her thoughts.

The State responds generally that Jones was not denied her right to counsel because Hay reasonably followed a trial strategy which advocated returning Jones to outpatient treatment, and not institutional care; Jones failed to show that proper objection could be made to the conduct of the trial; and the affidavit by Jones alleging the existence of three favorable witnesses preserved nothing for appeal.

CONCLUSION—Jones was not denied her right to effective counsel.

 Commitment proceedings for mentally ill persons require due process protection because of the social stigma and the possible loss of personal liberty which may result therefrom. *Addington v. Texas* (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323; *In re Turner* (1982), Ind. App., 439 N.E.2d 201. Among the protections available to the allegedly mentally ill person is the right to be represented by counsel. IC 16–14–9.1–10(c) (regular commitment statute incorporating by reference procedures provided in temporary commitment proceedings at IC 16–14–9.1–9(e)). The right to be represented by counsel includes the right to have counsel appointed when the allegedly ill person cannot afford an attorney. *Turner, supra.*

 Even though the ultimate goal of civil commitment is a beneficent one of providing aid to the mentally ill, the commitment hearing itself is designed, in part, to be an adversarial proceeding. For example, the allegedly ill person has the right to be present at the hearing, to testify, and to present and cross-examine witnesses. IC 16–14–9.1–10(c). It is the risk of erroneous decisions which due process protections seek to minimize. *Addington, supra,* at 425, 99 S.Ct. at 1808. If counsel fails to employ available protections, the ultimate finding of the trial court is less reliable. It

is for this reason that reversal is required when counsel fails to provide effective representation.[1]

In considering what constitutes effective representation, it seems reasonable to look to criminal standards for guidance. Such an approach seems justified inasmuch as the allegedly mentally ill person's liberty is at stake.[2] However, criminal procedural standards may not always be appropriate in determining due process in civil commitment proceedings. *E.g., State ex rel. Kiritsis v. Marion Probate Ct.* (1978), 269 Ind. 550, 381 N.E.2d 1245 (Privilege against self-incrimination is inapplicable in civil commitment proceedings.).

The test of counsel's effectiveness has been articulated in Indiana in *Lawrence v. State* (1984), Ind., 464 N.E.2d 1291. There our Supreme Court adopted the two-step analysis established by the United States Supreme Court in *Strickland v. Washington* (1984), — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674. It is the appellant's burden to

> "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

*Id.* at 2066.

■ The second step of the *Strickland* test requires that any deficiency in coun-sel's performance must be shown to be prejudicial to the defense. *Id.* at 2067. Except in certain instances when prejudice will be presumed, the defendant has the "burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 2069. In order to determine whether prejudice resulted from counsel's errors, the reviewing court must consider the totality of the evidence that was presented to the judge or jury. *Id.*

■ In examining the errors in representation alleged by Jones, we may not speculate regarding what may have been the most advantageous strategy in a particular case. *Smith v. State* (1984), Ind., 465 N.E.2d 702. Upon reviewing the trial record, it is apparent that Jones's counsel, Hay, pursued a trial strategy which advocated placing Jones in an environment less restrictive than that of Central State Hospital. This strategy necessitated eliciting facts concerning the extent of Jones's alleged mental illness. This is an acceptable strategy inasmuch as the trial court must determine both the need for commitment *and the appropriate facility* for the mentally ill person. IC 16–14–9.1–10.

This strategy explains much of Hay's at-trial performance. Jones alleges error in counsel's cross-examination of Dr. Jackson. For example, Hay asked Dr. Jackson:

> "Q Has anyone ever tried to get to the root of the problem ... misunderstanding or problem or whatever, that she has with taking medications, because it appears that she thinks taking this medication is the same and synonymous with addiction. There is a resistence [sic] to taking medications. I don't think that has anything to do with today but it was just sort of a thought. Something should be done—to ed-

---

**1.** Other jurisdictions have also found that the right to representation by counsel in civil commitment proceedings implies the right to effective representation. *See, e.g., In re Hutchinson* (1980), 279 Pa.Super. 401, 421 A.2d 261, *aff'd,* (1982), 500 Pa. 152, 454 A.2d 1008; *Ex parte Ullman* (Tex.Civ.App.1981), 616 S.W.2d 278.

**2.** We note that the State does not contest this conclusion, rather it assumes criminal effectiveness of counsel standards are applicable here.

ucate her to the needs of medicine or whatever if that would help her." *Record* at 51–52. Jones complains that this question was nonsensical or harmful to her case. The question, however, was part of counsel's exploration of the possibility of returning Jones to an outpatient treatment program, and we cannot say that counsel erred by pursuing this strategy. Similarly, we fail to see how error can be attributed to counsel because of unfavorable answers by Dr. Jackson regarding Jones's mental condition.

Jones claims she was prejudiced when Hay failed to object to several alleged errors on the part of the trial court. In reviewing such claims of error in the context of effectiveness of counsel, Jones must show that "had a proper objection been made, the trial court would have had no choice but to sustain the objection." *McAfee v. State* (1984), Ind., 459 N.E.2d 1186, 1188. Specifically, Jones contends that Hay erred when he failed to object to Dr. Jackson's expert testimony because of Dr. Jackson's "limited contact with Ms. Jones." *Appellant's Brief* at 15. Dr. Jackson's familiarity with Jones's case is clear from the record. He examined Jones on earlier occasions when she was receiving outpatient treatment, he examined Jones when she was first detained, and he supervised Jones's continuing treatment by the resident physician, *record* at 46, so the trial court would not have been compelled to sustain any such objection.

Another facet of claimed ineffectiveness is that counsel failed to object to the trial court's examination of Dr. Jackson. We anticipate for the moment the discussion in Issue Two concerning the court's examination of Dr. Jackson and note that no bias on the part of the trial court has been demonstrated. Of course, the trial judge must recuse if he or she is actually prejudiced, *Nelson v. State* (1982), Ind.App., 436 N.E.2d 1153, but we do not assume the existence of prejudice unless apparent from the record. *Clemons v. State* (1981), Ind., 424 N.E.2d 113.

Jones points to a question by the trial court as an indicator of judicial bias. After Dr. Jackson testified regarding Jones's violent tendencies and need for medicine, the trial court observed:

"The Court has known Miss Jones for several years now after she has been arrested, not infrequently it seems, and ended up in this hospital. So, if that's the pattern, is there ... What's it going to take for Miss Jones to someday make it so that she can just stop this? Or is it possible that she is incapable of changing?"

*Record* at 49. Rather than presume bias, "[t]he fact that a defendant has appeared before a certain judge in prior actions does not establish the existence of any bias or prejudice on that judge's part." *Clemons, supra* at 116. The trial court's expression of concern as to the treatment of Jones, an issue properly before the trial court, indicates the conscientious pursuit of his duty under IC 16–14–9.1–10. Similarly, other questions concerning the meaning of the term "character disorder," *record* at 50, as it was employed by Dr. Jackson, did not evidence prejudice by the trial court because the question of the *extent* of Jones's illness was properly before the court. Nor was Jones prejudiced because Hay failed to object to long, narrative answers given by Dr. Jackson. The form of testimony at trial, whether narrative or question-and-answer, is within the discretion of the trial court. *Scott v. State* (1982), Ind., 434 N.E.2d 86. Again, our review of the record indicates no abuse of discretion in accepting Dr. Jackson's testimony in narrative form.

Another allegation of ineffective representation is that Hay consulted with Jones in only a perfunctory fashion in preparing for the hearing. However, even in a criminal proceeding, prejudice must be demonstrated:

"The mere allegations of superficiality of pre-trial interviews of the defendant by his attorney is an insufficient basis for relief due to ineffective counsel, absent a showing of what additional information defendant would have provided the attorney and how the additional information would have aided in the preparation of his defense."

*Taylor v. State* (1982), Ind., 442 N.E.2d 1087, 1091; *see also Jackson v. State* (1975), 264 Ind. 54, 339 N.E.2d 557; *Fitch v. State* (1981), Ind.App., 428 N.E.2d 1374.

■ Jones attempts to show prejudice because Hay failed to call three available witnesses to testify on her behalf that she was not dangerous or gravely ill, a fact she contends must be accepted as true because no opposing affidavit was filed to her affidavit so stating. *Roberts v. Watson* (1977), 172 Ind.App. 108, 359 N.E.2d 615 (citing former Ind.Rules of Procedure, Trial Rule 59(D), current version at T.R. 59(H)). Such a statement does not constitute an affidavit *"showing the truth* of the grounds set out in the motion [to correct error]." T.R. 59(H)(1) (emphasis supplied). Jones's affidavit is a mere conclusion of law without supporting facts. *Cf. Curl v. State* (1980), 272 Ind. 605, 607, 400 N.E.2d 775, 776 (statement that "defendant was denied the right to testify as a witness in her own behalf" was conclusion of law rather than statement of fact).

■ Lastly, Jones objects to this interrogation by her counsel:

"Q Do you still have your suspicious suspicions [sic] of people, thinking that other people are controlling your thoughts?

A I never thought that people were controlling my thoughts. I control my own thoughts. People have tapped into me to know what I'm thinking.

Q So people steal your thoughts away?

A They haven't stolen anything.

Q People can read your mind. Is that what you're thinking?

A Can people read your mind?

Q Are you thinking that people can read your mind?

A Let's just say that ... You see, that is a yes or no question."

*Record* at 57–58. Although Hay's questioning might have been more artful, we cannot say it was error in the context in which it was asked. The questions arose in an attempt to show that outpatient treatment, as opposed to institutionalization was more appropriate in Jones's case. Even if the line of questioning was in error, it was not prejudicial to Jones as it was merely cumulative of Dr. Jackson's expert testimony regarding Jones's feelings of "thought control insertion." *Record* at 47. Nor was the error, if any, prejudicial in that the decision would not likely have been different absent the error. *Strickland, supra.*

ISSUE TWO—Whether judicial bias, constituting fundamental error, arose from the trial court's questioning of Dr. Jackson?

PARTIES' CONTENTIONS—Jones argues that the trial court's examination of Dr. Jackson constituted fundamental error because, by conducting the questioning, the court stepped out of its neutral stance and took a position in opposition to that of Jones.

The State responds that the trial court had the duty to elicit facts from Dr. Jackson in order to determine if Jones required treatment.

■ CONCLUSION—Judicial bias cannot be assumed merely because the trial court participated in the examination of Dr. Jackson. In fact, the trial court's power to examine witnesses is implicit in civil commitment proceedings because of the trial court's duty to determine if the allegedly mentally ill person is either gravely disabled or dangerous.

■ It is Jones's position that fundamental error occurred during her commitment hearing as a result of the trial court's examination of Dr. Jackson. In essence, she analogizes her civil commitment hearing to a criminal trial. It is true that it is a violation of due process to combine the roles of judge and prosecutor in criminal trials. *Figueroa Ruiz v. Delgado* (1st Cir.1966), 359 F.2d 718. However, many judicial proceedings permit or encourage the trial court to take an active part in the examination of witnesses. *See* E. CLEARY, McCORMICK ON EVIDENCE § 8, at 15 (3d ed. 1984). In fact, most restrictions on the court's power to examine witnesses are relaxed in trials to the court. *Id.* at 16. It must be remembered, too, that due pro-

cess is a flexible standard which "cannot be divorced from the nature of the ultimate decision that is being made." *Parham v. J.R.* (1979), 442 U.S. 584, 608, 99 S.Ct. 2493, 2507, 61 L.Ed.2d 101.

■ While we stress the need for procedural protections of the ill person's liberty interest, it is the commitment proceeding that determines whether treatment should be provided. The lack of treatment may be more damaging than the loss of liberty and the stigma occasioned by commitment. *See id.* at 601, 99 S.Ct. at 2503 ("[A]ppellees overlook a significant source of the public reaction to the mentally ill, for what is truly 'stigmatizing' is the symptomatology of a mental or emotional illness."). Actually, IC 16–14–9.1–10 does not require the petitioner to be represented by counsel at the commitment hearing. What is important is not so much the manner of presenting evidence as is the determination by the trial judge of the need for treatment. Thus, we find it in keeping with the statute for the trial court to have participated in the examination of Dr. Jackson.

We might observe further that the trial judge did not ask leading questions, argue with counsel, or cross-examine Jones. The message from the record is that he sought to discharge in a highly professional manner the duty imposed on him by IC 16–14–9.1–10.

In a similar setting, *i.e.*, the commitment of juveniles, the United States Supreme Court has suggested that the admitting physician is the only factfinder required by due process. *Parham, supra*, at 611, 99 S.Ct. at 2508. The Court impliedly recognized, at least in the context of the commitment of juveniles, that a lack of neutrality cannot be assumed on the part of the factfinder merely because of his or her participation in the examination of witnesses. *Id.*

ISSUE THREE—Whether Jones's commitment was based on sufficient evidence that she was either dangerous or gravely disabled?

PARTIES' CONTENTIONS—Jones argues that insufficient evidence was produced at trial that she was either dangerous or gravely disabled.

The State responds that sufficient evidence was produced at trial.

CONCLUSION—Testimony by Dr. Jackson that Jones was verbally assaultive and physically threatening was sufficient evidence from which the trial court could properly find that Jones was dangerous.

■ The trial court may only order regular commitment upon a finding of mental illness and *either* grave disability or dangerousness. IC 16–14–9.1–10(d)(1). In addition, the elements upon which commitment is ordered must be proven by clear and convincing evidence. *Addington, supra; In re Commitment of Linderman* (1981), Ind.App., 417 N.E.2d 1140. In reviewing a claim of insufficient evidence, we consider only that evidence most favorable to the judgment along with all favorable inferences therefrom, yet keep in mind that commitment may be ordered only upon a finding of clear and convincing evidence. *Cf. Orkin Exterminating Co. v. Traina* (1984), Ind.App., 461 N.E.2d 693 (review of clear and convincing evidence in award of punitive damages arising from tortious breach of contract).

■ We are convinced that sufficient evidence was produced at the hearing on which the trial court could properly find that Jones was dangerous and we therefore do not reach the question of disability. Dr. Jackson testified that Jones was verbally assaultive and physically threatening to such a degree that she was sequestered from other patients. *Record* at 47–48. Jones demonstrated these same tendencies by her own testimony. *Record* at 56. The doctor also testified that Jones exhibited character disorders of possibly sociopathic dimensions. *Record* at 50. These facts were clear and convincing proof of the element of dangerousness.

Affirmed.

SHIELDS, J., concurs.

SULLIVAN, J., concurs in result.