In the Matter of the Commitment of
GPH, Appellant–Respondent,

v.

David GILES, M.D., Appellee–Petitioner.

No. 49A05–9101–CV–19.

Court of Appeals of Indiana,
Fifth District.

Sept. 24, 1991.

Rehearing Denied Nov. 12, 1991.

Winston R. Hay, Hay and Oakes, Indianapolis, for appellant-respondent.

Myra C. Selby, Sherry A. Fabina–Abney, Ice, Miller, Donadio & Ryan, Indianapolis, for appellee-petitioner.

SHARPNACK, Judge.

GPH appeals from an order of regular commitment of him to Community North Hospital upon findings that he suffers from chronic paranoid schizophrenia and is both dangerous to himself and gravely disabled. We affirm.

GPH raises several issues on appeal, which we restate as follows:

(1) Whether the evidence was sufficient to support the trial court's finding that GPH should be involuntarily committed.

(2) Whether a court's finding that a patient is dangerous or gravely disabled is without support when the record does not reflect that anyone involved in the proceedings made an attempt to locate family members or friends who would be willing to help with, or be responsible for, the patient.

(3) Whether the trial court violated GPH's constitutional right to assistance of counsel when the court allowed GPH to appear at his preliminary hearing to determine probable cause without counsel.

(4) Whether required and adequate notice of the proceedings was given to GPH.

(5) Whether the trial court violated GPH's due process rights when the court refused to allow GPH to waive his court-appointed counsel for his commitment hearing.

(6) Whether the trial court committed error by allowing Dr. Giles to have access to GPH's medical records, and to testify regarding specific information contained therein, when GPH had not employed Dr. Giles as his physician.

(7) Whether the trial court committed error by allowing Dr. Giles to testify concerning communications Dr. Giles had with GPH when Dr. Giles was acting as GPH's treating physician.

The facts are as follows. GPH is a thirty-four-year old male, with a degree in electrical engineering, who has been diagnosed as suffering from chronic paranoid schizophrenia since the onset of an acute illness

in December of 1987. GPH was hospitalized for his mental illness for approximately two weeks in 1987 and again in the summer of 1988. In September of 1988, the court committed GPH to Carter Hospital for 90 days. After GPH's release from Carter Hospital in December of 1988, he was treated as an out-patient at Gallahue Mental Health Center at Community North Hospital, where Dr. David Giles served as a psychiatrist and medical director.

After his release from Carter Hospital, GPH lived with his mother. Ms. H testified at her son's final hearing that toward the end of the summer in 1990, her son became acutely ill once again, evidenced by his peculiar behavior during the last week of August. During that week in late August, GPH refused to take his medication, repeatedly turned his mother's electrical power on and off, disassembled his bed, and oftentimes sat outside at the picnic table, during the evenings, burning candles. In addition, GPH burned and scattered a video tape all over his mother's garage and storage room, and urinated in the backyard in the presence of his mother and other family members. Of particular concern to Ms. H during this week was the fact that GPH carried and fiddled a lot with a knife, once badly cutting his hand.

On the afternoon of September 1, 1990, GPH, clad only in cut-offs and a hat with a towel draped around his shoulders, wandered into the country home of Rosemary Huffman, who was there alone at the time. Ms. Huffman was both surprised and terrified to see a stranger in her foyer. When she confronted GPH, he identified himself as GPH, turned abruptly and walked out the front door.

After that incident, GPH again entered onto Huffman's property twice on September 4, 1990. Huffman, very upset, reported both incidents to the police. On that same day, Ms. H filed the necessary papers to have her son detained in Community North Hospital on an emergency basis as being both mentally ill and dangerous to himself.

On September 4, 1990, GPH's mother made a written application for GPH's emergency detention to Community North Hospital, pursuant to Ind.Code § 16–14–9.1–7(a), alleging that her son suffered from a psychiatric disorder and was dangerous to himself. Along with the application, and as required by I.C. § 16–14–9.1–7(a), Dr. David Giles filed a physician's statement alleging that GPH may be mentally ill and dangerous to himself. After reviewing both the application and the physician's statement, the court authorized the emergency detention of GPH. On September 10, 1990, pursuant to I.C. § 16–14–9.1–7(b), Dr. Giles submitted a statement and report, indicating that GPH suffered from chronic paranoid schizophrenia and was dangerous to himself. Dr. Giles recommended that GPH remain at Community Hospital North pending a hearing to determine whether GPH was mentally ill and either gravely disabled or dangerous, and to determine whether GPH needed continued involuntary detention. The court found that Dr. Giles' report justified the continued detention of GPH, and, pursuant to I.C. § 16–14–9.1–7(e)(2), ordered GPH's continued prehearing detention. The court set a final hearing date for September 20 to determine whether GPH was mentally ill and either dangerous or gravely disabled. The court also appointed counsel to represent GPH at his final hearing, and directed the sheriff to serve a copy of the order on GPH at Community Hospital North. Further, the court directed the clerk to give notice of the time and place of the final hearing, along with a copy of the order, to, among others, GPH's counsel.

On September 13, the court held a preliminary hearing to determine whether there was probable cause for Community North Hospital to detain GPH until his final hearing set for September 20. The court found probable cause to believe that GPH was in need of temporary commitment and ordered that GPH be detained pending his final hearing. The court directed that the parties should receive notice of the results of the preliminary hearing.

At the preliminary hearing of September 13, GPH, acting *pro se*, filed a motion to strike and quash the application for emer-

gency detention. That motion alleged that the notices of hearings furnished to GPH were illegible and unreadable, and thus failed to give him adequate notice of the proceedings. In addition, GPH filed an answer to the physician's statement, to the application for emergency detention, and to the petition for court-ordered treatment and special conditions for commitment.

At the final hearing on September 20, GPH objected to the court's appointment of a public defender to represent him, and requested that he be allowed to proceed *pro se.* After the court discussed the matter with GPH, the court continued the hearing until October 2.

On September 27, the court, "after much reflection," ruled that GPH would not be permitted to proceed *pro se.* On September 25, before its ruling, the court advised GPH's public defender that she would be appointed to represent GPH, and directed that GPH be notified both of the ruling and of the need to be prepared for a hearing on October 2.

On October 2, the court held a hearing to determine whether GPH was mentally ill, and either dangerous or gravely disabled, and in need of temporary commitment. At the hearing, GPH again objected to having a public defender represent him and the court overruled GPH's objection. Following testimony, the court issued an Order of Regular Commitment finding GPH mentally ill, dangerous to himself and gravely disabled.

Dr. Giles testified at GPH's final hearing that GPH was admitted to his care at Community Hospital North on September 4, 1990, and that he had examined and treated GPH daily throughout his hospital stay. Dr. Giles diagnosed GPH as suffering from chronic paranoid schizophrenia, which he testified is characterized by a disorder of thinking. Dr. Giles stated that GPH often has delusions of paranoia, unusual thinking, and no ability to understand his diagnosis and the disorder itself.

Specifically, GPH believes that there is electricity in the air which adversely affects his brain. To protect himself, GPH wears something around his head and con-

tinuously turns off the lights in his room. Further, during his hospital stay, GPH stated that he believed his food had been poisoned, so he refused to eat. In addition, GPH stated that he believed medicine was poisonous, so he refused to take medication. During this time, GPH refused to allow the hospital to run any laboratory tests on him, and he ate two possibly poisonous mushrooms or toadstools from the secured courtyard but refused to take the suggested medicine to induce vomiting.

Dr. Giles believes that GPH is mentally ill, is gravely disabled, and, as a result of GPH's disordered thinking, is potentially dangerous to himself. Dr. Giles believes that GPH is incapable of formulating ideas about how GPH could care for himself. To Dr. Giles's knowledge, GPH has refused to take any of the medications that Dr. Giles has ordered for him. GPH generally believes he will be fine without the medicine. With the medicine, Dr. Giles believes GPH would be able to think more clearly, would function better, and would require less restrictive care. Without the medicine, Dr. Giles believes that GPH would continue to suffer from delusional beliefs, paranoia, fears and anxieties, would be unable to function or to make reasonable decisions for himself, would potentially do dangerous things to himself, (such as eating inanimate objects or toxic substances), and could become malnourished with resulting serious medical complications.

Dr. Giles believes that if GPH is not treated for his chronic condition, he will not get out of the hospital setting. With regular commitment and continued treatment, Dr. Giles believes that GPH would eventually be released from the hospital and be treated as an out-patient for his incurable disease.

### *Sufficiency of the Evidence*

■ We deal first with whether the evidence was sufficient to support the trial court's finding that GPH should be involuntarily committed. In reviewing a claim of insufficient evidence in a commitment case, we keep in mind that commitment may be ordered only if the elements upon which

the commitment is ordered are proven by clear and convincing evidence, and we consider only that evidence most favorable to the judgment, along with all favorable inferences therefrom. *Jones v. State* (1985), Ind.App., 477 N.E.2d 353, 360.

■ Pursuant to I.C. § 16–14–9.1–3(a), a mentally ill person who is gravely disabled or dangerous may be involuntarily detained or committed. "Gravely disabled" is defined in I.C. § 16–14–9.1–1(b) as

a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) Is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or, (2) Has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

"Dangerous" is defined in I.C. § 16–14–9.1–1(c) as

a condition in which an individual as a result of mental illness presents a substantial risk that the individual will harm the individual or others.

GPH argues that there was not clear and convincing evidence either that he was dangerous to himself or to others, or that he was gravely disabled. GPH is asking us to reweigh the evidence, which we cannot do. The trial court's decision is supported by the evidence. The testimony of Dr. Giles, which alone would have been sufficient, is further supported by the testimony of both GPH's mother and Ms. Huffman.

As there was clear and convincing evidence that GPH was mentally ill, that he posed a substantial risk of harm to himself, and that he was gravely disabled, a commitment was appropriate. We affirm the trial court's decision on this issue.

### Failure to Prove Lack of Family or Other Support

■ Second, we deal with whether a court's finding that a patient is dangerous or gravely disabled must fail when the record does not reflect that anyone involved in the proceedings made an attempt to locate family members or friends who would be willing to help with, or be responsible for, the patient.

GPH argues that the evidence in the record is silent as to attempts to determine whether GPH had family or community support available to him. GPH contends that the Supreme Court has held that

a state cannot constitutionally confine without more a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

*O'Connor v. Donaldson* (1975), 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407. GPH next cites *In the Matter of the Commitment of Linderman* (1981), Ind.App., 417 N.E.2d 1140, 1141, for the proposition that "the burden rests with the State to prove a reasonable attempt has been made to contact family members in this regard." GPH argues that no one attempted to determine whether he had family members or community support available to him. GPH argues that because of this omission, the court's finding that he was gravely disabled must fail. We do not agree. We note, first, that there is no requirement for such proof in the commitment statutes. I.C. § 16–14–9.1–1 et seq.

GPH's own mother commenced the commitment proceedings, testifying at his hearing that she would have been "so relieved" if the police had taken GPH to the hospital where they would take care of him. The family member with whom GPH lived was already involved. Neither the court nor Dr. Giles had a responsibility to contact all of GPH's relatives and friends in an attempt to find someone who would either help with, or be responsible for, GPH. Through GPH's mother, GPH's family was on notice as to the proceedings to commit GPH.

GPH incorrectly relies upon *Donaldson* to support his argument. The Court in *Donaldson* noted that testimony presented at trial demonstrated that the patient had posed no danger to others either during his

confinement or at any other point in his life. *Donaldson*, 422 U.S. at 568, 95 S.Ct. at 2490, 45 L.Ed.2d at 403. Also, the Court noted that no evidence suggested that the patient had ever been suicidal or had ever been thought likely to inflict injury upon himself. *Id.* Finally, the Court noted that the patient's "frequent requests for release had been supported by responsible persons willing to provide him any care he might need on release." *Id.* What the Court found the evidence in *Donaldson* demonstrated was that the patient's confinement "was a simple regime of enforced custodial care, not a program designed to alleviate or cure his supposed illness." 422 U.S. at 569, 95 S.Ct. at 2490, 45 L.Ed.2d at 403. The purpose of *Donaldson* is to protect nondangerous individuals from being fenced in by the state, solely to prevent the state's citizens from being exposed to those whose ways are different. 422 U.S. at 575, 95 S.Ct. at 2494, 45 L.Ed.2d at 407. In GPH's case, the trial court has determined that GPH is not only mentally ill, but also dangerous to himself and gravely disabled. In contrast to *Donaldson*, testimony was presented at trial to demonstrate that GPH posed a danger to himself. Also in contrast to *Donaldson*, GPH has not made a request for release which is supported by responsible persons willing to provide him with the care he might need on release.

*Linderman,* too, is distinguishable from GPH's case. In *Linderman,* the appellate court stated that there was no evidence of any violent behavior by the patient. The appellate court found no evidence that Linderman had ever "threatened physical harm to himself or anyone else...." *Linderman,* 417 N.E.2d at 1141. The purpose of *Linderman* is to prevent nondangerous, mentally ill patients, who have family members or responsible community members willing to care for them, from being involuntarily committed. *See also, Cheek v. State* (1991), Ind.App., 567 N.E.2d 1192. Such is not GPH's case. The trial court has determined that GPH is mentally ill, dangerous to himself, and gravely disabled. It was not necessary to prove that there were no relatives or friends who would have taken on the responsibility of providing care for GPH.

## Lack of Counsel at Preliminary Hearing

■ Third, we deal with whether the trial court violated GPH's constitutional right to assistance of counsel when the court allowed GPH to appear at the preliminary hearing to determine probable cause without counsel.

GPH argues that he was unconstitutionally unrepresented at a critical time in his commitment proceedings. GPH contends that his preliminary hearing constituted a time when testimony was being given and decisions affecting his liberty were being made, yet he appeared at the hearing unrepresented by counsel.

The procedures due to GPH at his preliminary hearing are set out in I.C. § 16–14–9.1–7, pertaining to emergency detention. As GPH alleges, this statute does not afford GPH the right to counsel at the probable cause stage of his commitment proceeding. However, we must presume that the statute is valid and uphold it, unless it is clearly unconstitutional. *Van Sant v. State* (1988), Ind.App., 523 N.E.2d 229, 233.

In deciding whether the emergency detention statute unconstitutionally denies GPH of his right to assistance of counsel, we must determine whether a state, in carrying out its *parens patriae* role, may limit a mental patient's constitutional rights.

In *State v. Levitt* (1965), 246 Ind. 275, 281, 203 N.E.2d 821, 824, our supreme court stated that "no right, constitutional, fundamental or otherwise, is absolute and unlimited...." Additionally, in *Avery v. Faulkner* (1984), Ind.App., 471 N.E.2d 1226, 1228, the third district stated that "constitutionally guaranteed rights can be restricted if the restriction furthers a substantial government interest...."

The Supreme Court has recognized that the state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for

themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

*Addington v. Texas* (1979), 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331. In *State v. Criminal Court of Marion County* (1955), 234 Ind. 632, 648, 130 N.E.2d 128, 136, the chief justice of our supreme court, in a concurring opinion, explained the state's *parens patriae* power as follows:

> The fact that trial by jury is denied on the issue of determining whether the defendant is a criminal sexual psychopathic person does not make [Acts 1949, ch. 124, § 1] unconstitutional. The Legislature attempted to recognize that a psychopathic person is a mental defective. Under the ancient jurisdiction of equity, mental defectives were within the control of the chancellor representing the Crown as *parens patriae.* (citations omitted)

Our courts have already faced the issue of the state's *parens patriae* power in light of the constitutional rights of the mentally ill. In *In the Matter of Commitment of Binkley* (1978), 178 Ind.App. 301, 307, 382 N.E.2d 952, 956, the first district, in considering whether due process requires the highest standard of proof during a commitment proceeding, where personal liberty is at stake, stated:

> The State, as *parens patriae* undertakes the beneficent task of treating the mentally ill, and under its police power protects the public from harm. These are valid, necessary state objectives which should not be thwarted by a too strict burden of proof.

In *F.J. v. State* (1980), Ind.App., 411 N.E.2d 372, the fourth district considered an appeal from an individual who, like GPH, had been detained on an emergency basis and then temporarily committed. The court there stated that

> where someone ... is already in custody and then temporarily committed, only a careful adherence to the protective measures of I.C. 16–14–9.1–9(d), (e), (f), combined with effective and timely notice of such rights ... will afford the substan-

tial protection necessary to guard against any unwarranted deprivation of liberty of an allegedly mentally ill individual.

*Id.* at 386.

The state, in carrying out its *parens patriae* role for the limited periods set out in the emergency detention statute, furthers the substantial governmental interests of caring for the mentally ill and of protecting the public from harm. Because the trial court carefully adhered to the protective measures of the temporary commitment statute, and because the court gave GPH effective and timely notice of his rights pursuant to the temporary commitment statute, we find that GPH was adequately safeguarded against an unwarranted deprivation of his liberty. Thus, even though the emergency detention statute does not afford GPH the right to counsel at his preliminary hearing, we determine that the statute is valid and we uphold it. The state, in exercising its *parens patriae* role and for the finite period specified in the emergency detention statute, may limit an alleged mental patient's constitutional right to counsel. We therefore find that the trial court here did not violate GPH's constitutional right to assistance of counsel by allowing GPH to appear at his preliminary hearing without counsel.

### *Sufficiency of Notice*

■ Fourth, we deal with whether required and adequate notice of the proceedings was given to GPH.

GPH directs us to I.C. § 16–14–9.1–9(e)(1) and argues that a person alleged to be mentally ill has the right to receive adequate notice of the person's temporary commitment hearing so that the individual or the individual's attorneys may prepare for the hearing. GPH contends that he did not receive adequate notice of his commitment hearing because he was furnished with illegible copies of his mother's application for his emergency detention and Dr. Giles's accompanying physician's statement.

In *In the Matter of the Commitment of Binkley* (1978), 178 Ind.App. 301, 382

N.E.2d 952, the first district explained when notice to an alleged mental patient of their temporary commitment hearing would be constitutionally sufficient. The court found that Binkley's notice, which was in writing and set forth the time, place and purpose of the hearing, passed "the due process muster." *Binkley*, 178 Ind.App. at 304, 382 N.E.2d at 954. The court explained that the primary purpose of notice to a defendant in temporary commitment proceedings is to inform the individual of the nature of the pending action and to afford the individual with a reasonable opportunity to make a defense. *Binkley*, 178 Ind.App. at 303, 382 N.E.2d at 954.

In GPH's case, the record indicates that, on September 13, the judge filed an order that both continued GPH's detention and set a final hearing. The order legibly indicated the time, place and date of the hearing. The order further stated that the purpose of the hearing was to determine whether GPH was mentally ill and either dangerous or gravely disabled and in need of temporary commitment. The order directed that GPH's appointed counsel should continue to serve unless GPH retained other counsel or validly waived his right to counsel. Finally, the order directed the clerk to mail a copy of the order to, among others, GPH.

While GPH may not have been able to read portions of the contents of the September 4th Physician's Emergency Statement and Application for Emergency Detention, the court's order of September 13th was very clear as to the time, place, date and purpose of GPH's pending commitment hearing. We find sufficient evidence from the record to indicate that GPH did receive adequate notice of his temporary commitment proceeding as required by I.C. § 16–14–9.1–9(e). Therefore, this argument by GPH must fail.[1]

*Denial of Waiver of Counsel*

Fifth, we consider whether the trial court violated GPH's constitutional right to due process when the court refused to allow GPH to waive his court-appointed counsel for his commitment hearing.

GPH argues that the trial court abused its discretion by refusing to allow him to proceed *pro se*, and he asserts that those claimed to be mentally ill enjoy the same rights concerning self-representation as people who are not mentally ill. GPH cites *People v. Joseph* (1983), 34 Cal.3d 936, 196 Cal.Rptr. 339, 671 P.2d 843, for the proposition that, absent a finding based upon credible evidence that the person is incompetent to waive counsel or actions of the person which would be disruptive of the court, the trial court should allow self representation.

In Indiana, a person who is alleged to be mentally ill is statutorily assured of the assistance of counsel. First, I.C. § 16–14–9.1–9(e)(4) states that an individual alleged to be mentally ill has the right to be represented by counsel in a temporary commitment proceeding. Second, I.C. § 16–14–9.1–9(g) states that a person alleged to be mentally ill may be represented by counsel in a temporary commitment proceeding, and, upon a showing of indigency, the court may appoint counsel for the person. *See also In the Matter of the Mental Commitment of Larry Utley* (1991), Ind.App., 565 N.E.2d 1152.

Because no Indiana case law addresses the issue of when a mental patient may effectively waive the right to counsel, we look for guidance to the case law regarding waiver of counsel in the criminal context. In *Kirkham v. State* (1987), Ind.App., 509 N.E.2d 890, the first district explained Indiana's procedure for validly waiving the right to counsel. "If a defendant elects to represent himself, it must be shown that he knowingly and voluntarily waived his right to be represented by counsel." *Kirkham*,

---

**1.** GPH also argues that he received inadequate notice of his preliminary hearing. We use the same analysis for that argument that we previously used with respect to provision for counsel, and determine that the state, in carrying out its *parens patriae* role for the limited periods set out in the emergency detention statute, may limit an individual's right to notice of the preliminary hearing so long as the trial court adheres to the protective measures of the temporary commitment statute and affords the individual effective and timely notice of the final hearing pursuant to that statute.

509 N.E.2d at 892, citing *Johnson v. Zerbst* (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; *McDandal v. State* (1979), 180 Ind. App. 654, 390 N.E.2d 216. The trial court must determine whether the waiver was knowing and voluntary. Therefore, the trial judge "must establish a record showing that the defendant was made aware of the nature, extent, and importance of the right and the consequences of waiving it." *Kirkham*, 509 N.E.2d at 892.

In the same year that *Kirkham* was decided, the U.S. District Court in South Bend considered *Havrilenko v. Duckworth*, 661 F.Supp. 454 (N.D.Ind.1987), which was a petition for a writ of habeas corpus where the petitioner argued that he was denied effective assistance of counsel at his sentencing. In deciding that case, the court dealt with the issue of when a defendant may proceed *pro se*, and stated the following:

> Thus, before a defendant proceeds *pro se*, the court must ascertain: (1) that the defendant voluntarily, knowingly, and intelligently waived his right to counsel; (2) that he understood the charges against him and the magnitude of the potential penalty; and, (3) that he understood that he would be expected to handle his defense in accordance with the normal rules of evidence and procedure. [citations omitted] It is axiomatic that a defendant may represent himself in a criminal proceeding.

*Id.* at 461.

Two other jurisdictions that were faced with the issue of when a mental patient may validly waive the right to counsel have applied the above-mentioned criminal analysis to their cases. *Lanett v. State* (1988), Tex.App., 750 S.W.2d 302, and *Matter of S.Y.* (1990), App., 156 Wis.2d 317, 457 N.W.2d 326. In *Lanett*, the trial court decision to not allow waiver of counsel was affirmed because, from the record, it appeared that "the court could have found that Ms. Lanett was not capable of knowingly and intelligently waiving her right to court-appointed counsel." 750 S.W.2d at 305. Specifically, the appellate court considered the following: three psychiatric certificates which all indicated Lanett was mentally ill; Lanett's courtroom behavior, which included several outbursts and lying prostrate on the courtroom floor; and, the fact that the same judge presided over both the probable cause hearing and the final trial for court-ordered mental health services, thereby enabling him to pull from facts he had heard in the probable cause hearing to decide against allowing Lanett to waive counsel. *Id.*

In *Matter of S.Y.*, the trial court decision to allow waiver was affirmed on the ground that the patient

> knew the county was requesting an extension of commitment; he knew the elements required to obtain an involuntary commitment and the applicable burden of proof; and he had been through a jury trial and knew he would have to follow the same rules as an attorney.

*S.Y.*, 457 N.W.2d at 329.

Further, the court found that "[t]he record supports the trial court's determination that S.Y. was competent to represent himself," noting that the record revealed that S.Y. had two years of college and was literate and fluent in English. *Id.* The court stated that "[t]he only significant issue is whether [S.Y.] possessed a 'psychological disability which ... significantly affect[ed] his ability to communicate a possible defense to the jury.'" *Id.*, citing *Pickens v. State* (1980), 96 Wis.2d 549, 292 N.W.2d 601.

In determining whether a person may waive counsel in a commitment proceeding, a principal concern must be whether the patient is capable of making such a decision. In reviewing the case before us, we find that there is substantial evidence to support the trial court's finding that GPH could not knowingly, voluntarily and intelligently waive his right to counsel. The evidence indicates that GPH's psychiatrist testified on September 20 that GPH suffered from paranoia and delusions; that the trial judge had the opportunity to observe GPH's demeanor at both the preliminary hearing and at the proceeding of September 20; that the judge, by also presiding over GPH's preliminary hearing, heard

testimony from two witnesses, one of which was GPH's mother, concerning GPH's mental health; that the trial judge indicated she had reservations about whether GPH could handle his own defense in accordance with the rules of evidence and procedure; and, that the judge was concerned that GPH's desire to represent himself might be a symptom of his illness. There is sufficient evidence on the record to indicate that GPH was incapable of knowingly, voluntarily and intelligently waiving his right to counsel.

### Use of Medical Records at Trial

■ Sixth, we deal with whether the trial court committed error by allowing Dr. Giles to have access to GPH's medical records, and to testify regarding specific information contained therein, when GPH had not employed Dr. Giles as his physician.

GPH first contends that he did not waive access to his medical records, thus his records should not have been disclosed to Dr. Giles because he did not employ Dr. Giles as his physician. Second, GPH contends that the court should have prohibited Dr. Giles' testimony based upon the physician-patient privilege. GPH argues that physicians shall not be considered competent witnesses as to matters communicated to them by patients in the course of their professional business, or as to advice given in such cases. I.C. § 34-1-14-5. Further, GPH argues that the purpose of the physician-patient privilege is "the promotion and protection of confidence of a certain kind," and that the inviolability of this confidence is more important than "the results sought through compulsory disclosure in a court of justice." *Penn Mutual Life Ins. Co. v. Wiler* (1884), 100 Ind. 92, 100.

The statute that controls this issue is I.C. § 16-4-8-3.1. Pursuant to the relevant portions of this statute, the mental patient's health record may be disclosed, without the patient's consent, to individuals who are employed by the provider at the same facility and who are involved in the planning, provision, and monitoring of services. I.C. § 16-4-8-3.1(f)(1).

Evidence presented at GPH's final hearing indicates that Dr. Giles was a psychiatrist and the medical director at Gallahue Mental Health Center at Community Hospital. In addition, Dr. Giles testified that, beginning on September 4, 1990, he had treated and examined GPH daily. Even though Dr. Giles was not employed by GPH, Dr. Giles met the requirements set out in I.C. § 16-4-8-3.1(f)(1), and was thus statutorily authorized to have access to GPH's records.

■ In *Smith v. State* (1972), 259 Ind. 187, 285 N.E.2d 275, our supreme court considered the issue of whether the trial court should have excluded the testimony of two court appointed expert witnesses where the testimony was based in part on information the experts gained from hospital reports. The court in *Smith* stated that, while medical reports that contain observations and expert opinions about an individual's sanity or insanity may not be admitted directly into evidence, another expert may use the reports to formulate his or her opinion as to the individual's sanity. 259 Ind. at 189, 285 N.E.2d at 275-6. The court further stated that

> (t)he function of an expert witness in a case concerning sanity or insanity is advisory in nature. He does not state a *fact* but gives an *opinion* in order to aid the jury or trier of fact. The trier of fact must make the ultimate decision on this issue. (citation omitted) The reports are not accepted by the expert testifying as true facts but are examined by him to provide an aid in diagnosis.

*Smith*, 259 Ind. at 189, 285 N.E.2d at 276. Finally, the court in *Smith* stated that the expert witness should use the types of records and reports that have been produced by qualified personnel and that the expert customarily relies on. 259 Ind. at 190, 285 N.E.2d at 276. According to the court, these limitations will guarantee "a relatively high degree of reliability" and will free an expert "to use the tools he normally relies upon in making any diagnosis." *Smith*, 259 Ind. at 191, 285 N.E.2d at 276.

Dr. Giles testified that he used GPH's medical records, which were produced by

qualified personnel, for diagnostic purposes and to formulate an opinion. Further, GPH's records were the type upon which Dr. Giles customarily relies.

Because Dr. Giles was statutorily authorized to have access to GPH's records, and because Dr. Giles used those records to diagnose GPH and to form an opinion, we find that the trial court did not err by allowing Dr. Giles to have access to GPH's medical records and to testify regarding specific information contained therein.

### Physician–Patient Privilege

■ Finally, we deal with the issue of whether the trial court erred by allowing Dr. Giles to testify concerning communications Dr. Giles had with GPH when Dr. Giles was acting as GPH's treating physician.

GPH argues that Dr. Giles did more than just examine GPH for purposes of the commitment proceeding. GPH notes that Dr. Giles had daily contact with him between September 4 and October 2, during which time Dr. Giles acted as GPH's treating physician. GPH contends that the court should have disallowed any information Dr. Giles gained through such contact based on the physician-patient privilege. GPH argues that the court erred when it allowed Dr. Giles to testify as both a treating physician and as an expert witness.

This issue overlaps with the issue of confidentiality, and we analyze it in a similar manner. The same principle that applies to a physician's testimony regarding information contained within a mental patient's medical records applies to testimony regarding communications that the physician had with the patient during the patient's treatment phase. If we do not allow physicians who care for the mentally ill to present as evidence information that they obtain through personal contact with the patient, we will defeat the essential purpose of the commitment statute.

At GPH's commitment hearing, the very issue was GPH's mental health. The statements that Dr. Giles repeated at GPH's commitment hearing went to the issue of GPH's mental health. Dr. Giles used GPH's statements for diagnostic purposes and to formulate his opinion that GPH was mentally ill, dangerous to himself and gravely disabled. The physician-patient privilege which might otherwise exist must yield to the limited extent necessary to permit a full consideration of the patient's mental condition within the framework of the commitment statute. The communications at issue here were thus admissible evidence.

For the reasons stated, we find that the court did not err when it allowed Dr. Giles to testify concerning communications Dr. Giles had with GPH during GPH's treatment.

AFFIRMED.

HOFFMAN, J., concurs.

RUCKER, J., concurs in result with separate opinion.

RUCKER, Judge, concurring in result with separate opinion.

I concur in result with the majority opinion. The trial court determined GPH was both gravely disabled and dangerous thereby justifying GPH's involuntary commitment. I agree the evidence in this case is sufficient to establish GPH is gravely disabled. However, I am unpersuaded there is clear and convincing evidence demonstrating GPH presents a "substantial risk" that he will harm himself or others. Ind. Code § 16–14–9.1–1(c).