

I N   T H E

# Court of Appeals of Indiana

In the Matter of D.S.,
A Child in Need of Services,

D.S.,

*Appellant-Respondent Child*



FILED

Mar 23 2026, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

---

March 23, 2026

Court of Appeals Case No.
25A-JC-1881

Appeal from the Hendricks Superior Court

The Honorable Travis L. Bauman-Crane, Judge

Trial Court Cause No.
32D03-2501-JC-1

---

**Vaidik, Judge.**

## Case Summary

[1] After adjudicating D.S. to be a child in need of services (CHINS), the juvenile court entered a dispositional decree awarding wardship of D.S. to the Department of Child Services (DCS). The court later modified the dispositional decree to authorize DCS to place D.S. in a state institution for inpatient psychiatric treatment under Indiana Code section 12-26-3-2, which allows a child's "parent or legal guardian" to apply to a facility for admission of the child for voluntary treatment. D.S. appeals the modification.

[2] We hold that DCS being awarded wardship of D.S. is not the same as being appointed her legal guardian, and therefore DCS did not have the same authority as a parent or legal guardian under Section 12-26-3-2 to apply to a facility for D.S. to be admitted for voluntary treatment. Since the treatment here was not voluntary, the only avenue for having D.S. admitted to a state institution was an involuntary civil commitment, which requires a civil-commitment proceeding. Because the juvenile court here authorized D.S.'s placement in a state institution without affording her a civil-commitment proceeding, we reverse. On remand, we instruct the court to refer the matter to

the court having probate jurisdiction for a civil-commitment proceeding or to initiate such a proceeding itself under probate law.

## Facts and Procedural History

[3] D.S., born in June 2010, and her brother were adopted by W.S. and S.S. ("Parents") in 2016 after their biological parents' parental rights were terminated. D.S. has a variety of mental-health diagnoses and a history of self-harming behaviors and suicidal ideations. From 2021 to 2024, D.S. had multiple hospital admissions and stays at residential-treatment facilities. Additionally, police responded to the family home six times due to D.S. threatening to harm herself, Parents, or her brother.

[4] In December 2024, D.S. was twice admitted for acute stays at Hendricks Behavioral Hospital due to self-harming behaviors. Parents contacted DCS to inquire about "what other additional resources or different things could be put into place" because they "ha[d] tried and done everything possible to help [D.S.]." Tr. p. 14. DCS conducted a family evaluation and concluded that "[P]arents have done what they could with the resources they have and right now they need DCS's help and the Court's intervention." *Id.* at 18. Accordingly, DCS filed a petition alleging that D.S. is a CHINS. The juvenile court appointed D.S. a court-appointed special advocate (CASA) and later appointed her counsel through Child Advocates, Inc., a nonprofit organization.

[5] D.S. was placed at Safe Passage in January 2025 for an evaluation and recommendations. The psychologist who performed the diagnostic evaluation

recommended that D.S. be placed in a state hospital. NeuroDiagnostic Institute (NDI), a state hospital, had a four-to-six-month wait for a bed, so D.S. was put on the waitlist. In April, Parents, DCS, and CASA submitted an agreed entry on fact-finding and disposition in which Parents admitted that D.S. is a CHINS. The agreed entry provided that D.S, who was still at Safe Passage, "will continue to be placed in a mental health facility." Appellant's App. Vol. 2 p. 30. The juvenile court accepted the agreed entry, adjudicated D.S. to be a CHINS, and entered a dispositional decree awarding wardship of D.S. to DCS.

[6] In June, D.S. was moved to a therapeutically licensed foster placement on a temporary basis while waiting for an opening at NDI. Later that month, the parties learned that a bed at NDI would soon be available. D.S., by counsel, moved to modify the dispositional decree to allow her to remain in her foster placement. She argued that placement in a state hospital, which had been recommended nearly five months prior, "is no longer the least restrictive, most family-like, and most appropriate setting available, consistent with [her] best interests." Tr. p. 50. DCS filed its own motion for modification requesting authorization to change D.S.'s placement to NDI and noting that a bed would be available for her there on July 21. D.S.'s CASA submitted a report to the court agreeing that D.S. should be placed at NDI.

[7] The juvenile court held a hearing on the parties' motions on July 16. DCS relied on Indiana Code section 12-26-3-2, which allows a child's parent or legal guardian to apply to a facility for the child to be admitted for voluntary treatment. DCS explained that it had "already initiated the placement as

[D.S.'s] legal guardian," and NDI had "accepted [D.S.]." *Id.* at 52. Thus, DCS explained, it was "asking the Court to simply allow that placement to occur." *Id.* D.S.'s counsel argued that authorizing such a placement is "outside of the dispositional authority of a juvenile court" and that DCS needed to petition for a civil commitment to have D.S. placed in inpatient psychiatric treatment. *Id.* at 51. The court asked the parties to submit briefs on the issue of the court's authority and set another hearing in two days because the bed at NDI would only be available until July 21.

[8] At the second hearing, the parties rested on their briefs, and the court concluded that "voluntary commitment of the Child in NDI for in-patient psychiatric treatment is within the authority of the Court under a combined reading of Indiana Code 31-34-20 and Ind. Code 12-26." Appellant's App. Vol. 2 p. 94. The court then heard evidence as to what placement is in D.S.'s best interests. Jackie Parrish, D.S.'s therapeutically licensed foster placement, wished to continue as D.S.'s placement. Parrish testified that, in the six weeks D.S. had been in her care, D.S. hadn't engaged in any self-harm, and she hadn't needed additional support (such as DCS or the police) to control D.S.'s behavior. W.S., D.S.'s father, believed that it's in D.S.'s best interests to be treated at NDI. After the close of evidence, the court concluded that placement at NDI is in D.S.'s best interests. Accordingly, the court modified the dispositional decree "by adding the authorization of treatment services to the child through a voluntary commitment process at NDI." *Id.*

D.S. now appeals. A recent filing by DCS indicates that D.S. is being considered for discharge, but as of the date of this opinion, she is still at NDI. *See* Motion for Hearing, Cause No. 32D03-2501-JC-1 (Mar. 13, 2026). A hearing is set for March 25.

## Discussion and Decision

D.S. contends that the juvenile court lacked the authority to modify the CHINS dispositional decree to authorize DCS to place her in inpatient psychiatric treatment at NDI without first initiating civil-commitment proceedings. The juvenile court's conclusion that it has such authority was based on "a combined reading" of Indiana Code chapter 31-34-20, which governs dispositional decrees in CHINS cases, and Indiana Code article 12-26, which governs "Voluntary and Involuntary Treatment of Mentally Ill Individuals." While we generally afford deference to the trial court when reviewing a CHINS disposition, *In re A.C.*, 198 N.E.3d 1, 9-10 (Ind. Ct. App. 2022) *reh'g denied*, *trans. denied*, because this case presents an issue of statutory interpretation, our review is de novo, *In re P.F.*, 268 N.E.3d 777, 781 (Ind. Ct. App. 2025). Our objective in interpreting a statute is "to ascertain and give effect to the legislative intent," and "[w]e presume that our legislature intended its language be applied in a logical manner consistent with the underlying goals and policy of the statute." *In re G.W.*, 977 N.E.2d 381, 385 (Ind. Ct. App. 2012), *trans. denied*. "Statutes relating to the same general subject matter . . . should be construed together to produce a harmonious statutory scheme." *Id.*

Once a child has been adjudicated a CHINS, "the juvenile court may enter one (1) or more of the following dispositional decrees" (among others):

> (2) Order the child to receive outpatient treatment . . . .
>
> (3) Remove the child from the child's home and authorize the department to place the child in another home, shelter care facility, child caring institution, group home, or secure private facility. . . .
>
> (4) Award wardship of the child to the department for supervision, care, and placement.

Ind. Code § 31-34-20-1(a). It is undisputed that NDI is not a shelter-care facility, child-caring institution, or secure private facility;[1] it is a "State institution." I.C. § 12-7-2-184(b)(6).

As D.S. highlights, the court's dispositional options do not include ordering inpatient treatment or authorizing placement at a state institution. Nonetheless, DCS contends that the juvenile court had the authority to authorize D.S.'s placement at NDI as part of the CHINS disposition based on Indiana Code

---

[1] A "shelter care facility" is "a place of residence that: (1) is licensed under the laws of any state; and (2) is not locked to prevent a child's departure unless the administrator determines that locking is necessary to protect the child's health." I.C. § 31-9-2-117. A "child caring institution" is "(1) a residential facility that provides child care on a twenty-four (24) hour basis for more than ten (10) children; or (2) a residential facility with a capacity of not more than ten (10) children that does not meet the residential structure requirements of a group home." I.C. § 31-9-2-16.7. And a "secure private facility" is a "facility that is licensed under IC 31-27 to operate as a secure private facility" other than a juvenile detention facility, a facility operated by the department of correction, a county jail, or a detention center operated by a county sheriff. I.C. § 31-9-2-115. DCS doesn't argue that NDI meets any of these definitions.

sections 12-26-3-2 and 31-34-19-5. Under Section 12-26-3-2(a), "If an individual is less than eighteen (18) years of age, an application under this chapter may be made" to a facility "by the individual's parent or legal guardian" for the individual to be admitted to the facility for voluntary treatment. DCS argues that because the juvenile court granted it wardship of D.S., it could "act[] as [her] legal guardian" under this statute and apply to NDI for her admission for voluntary treatment. Appellee's Br. p. 17. Although "voluntary treatment" in a state institution isn't an option under the CHINS dispositional statutes, Section 31-34-19-5 alludes to a court authorizing such treatment. That statute states:

> If the court authorizes a child who is under the custody or supervision of a local office or the department to be placed in a state institution (as defined in IC 12-7-2-184) for voluntary treatment in accordance with IC 12-26-3, the court may not release the department from obligations of the local office or the department to the child until a parent, guardian, or other responsible person approved by the court assumes the obligations.

[13] DCS claims that since Section 31-34-19-5 references a court authorizing the placement of a child in a state institution for voluntary treatment, "the CHINS court had statutory authority to authorize DCS acting as [D.S.'s] parent or guardian, to place [D.S.] for voluntary treatment at NDI." Appellee's Br. p. 17. This argument is a nonstarter because DCS is not D.S.'s legal guardian. Being granted wardship of D.S. does not make DCS her legal guardian. As part of a permanency plan, a CHINS court may appoint a legal guardian for the child as provided in Indiana Code sections 31-34-21-7.5 and 31-34-21-7.7. But neither

statute contemplates DCS as a guardian, and the court didn't appoint a guardian here.

[14] In the context of a CHINS disposition, a guardianship and a wardship are not the same thing. When a CHINS court appoints a legal guardian for a child, the guardian "is a caretaker in a judicially created relationship between the child and caretaker that is **intended to be permanent and self-sustaining**." I.C. § 31-34-21-7.5(c)(1)(D) (emphasis added). A wardship, on the other hand, "means the responsibility for **temporary care and custody of a child** by transferring the rights and obligations from the child's parent, guardian, or custodian to the person granted wardship." I.C. § 31-9-2-134.5(a) (emphasis added). If the legislature intended for a person (or entity) having wardship of a child to have the same authority as a parent or legal guardian to apply to a facility for voluntary treatment for the child, it could have said so in Section 12-26-3-2 or in the CHINS statutes discussed above. *See In re J.W., Jr.*, 27 N.E.3d 1185, 1189 (Ind. Ct. App. 2015) ("[I]n interpreting a statute, we must consider not only what the statute says but what it does not say. In other words, we are obliged to suppose that the General Assembly chose the language it did for a reason." (quotations and citations omitted)), *trans. denied*. Because no application to NDI was made by a parent or legal guardian, and because D.S. opposed being placed

there, this was not an admission for voluntary treatment; it was an involuntary civil commitment.[2]

[15] Because an involuntary civil commitment is a "significant deprivation of liberty," the formal civil-commitment procedures set forth in Indiana Code article 12-26 must be followed to protect the respondent's due-process rights *H.J. v. Health & Hosp. Corp.*, 243 N.E.3d 375, 379 (Ind. Ct. App. 2024), *trans. denied*. In the context of a CHINS case,

> If it appears to the juvenile court that a child has a mental illness, the court may:
>
> > (1) refer the matter to the court having probate jurisdiction for civil commitment proceedings under IC 12-26; or
> >
> > (2) initiate a civil commitment proceeding under IC 12-26.

I.C. § 31-34-19-3. In other words, the juvenile court can either refer the matter to the probate court to conduct a civil-commitment proceeding or act as a probate court and initiate such a proceeding itself. *See* 15A Ind. Prac., Family Law—Children in Need of Services § 25:10 (2025). Either way, the standard civil-commitment procedures in Article 12-26 must be followed.

---

[2] The dissent emphasizes that Parents consented to D.S.'s placement at NDI. But as DCS highlights, by granting wardship of D.S. to DCS, the juvenile court transferred to DCS Parents' rights and obligations and the responsibility for D.S.'s care and custody. *See* I.C. § 31-9-2-134.5(a). By DCS's own argument, then, Parents' consent is inconsequential because they no longer have the right to make decisions about D.S.'s care or custody.

[16] "To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence[.]" *Civ. Commitment of T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015) (quotation omitted). Had D.S. been afforded the commitment proceeding to which she was entitled, DCS would have had to show by clear and convincing evidence that she is either dangerous or gravely disabled. *See* I.C. § 12-26-2-5(e). But the juvenile court considered D.S.'s placement only in the context of a motion to modify the CHINS dispositional decree. So, instead of the clear-and-convincing evidence standard, the court's findings needed only be supported by a preponderance of the evidence. *See* I.C. §§ 31-34-19-10, 31-34-12-3. And rather than determining whether D.S. is dangerous or gravely disabled, the focus of the hearing was her best interests. *See* I.C. § 31-34-23-6(g). By authorizing DCS to place D.S. at NDI for inpatient psychiatric treatment without first affording her a commitment proceeding, the juvenile court deprived D.S. of due process.

[17] Further, as D.S. points out, although she was fortunate enough to be represented by an attorney through a nonprofit organization, children alleged to be in need of services or who have been adjudicated CHINS aren't entitled to representation by counsel. *See* I.C. § 31-32-4-1. On the other hand, an individual for whom involuntary commitment is sought has an absolute right to an attorney to represent their legal interests. I.C. § 12-26-2-2(b)(4); *see also Jones v. State*, 477 N.E.2d 353, 356-57 (Ind. Ct. App. 1985) (explaining that individuals alleged to be mentally ill have a "right to effective counsel" in a commitment

proceeding and that "the commitment hearing itself is designed, in part, to be an adversarial proceeding"), *reh'g denied*, *trans. denied*. Allowing children to be placed in inpatient psychiatric treatment as part of a CHINS disposition rather than a commitment proceeding means that children can be committed without being represented by an attorney. The appointment of a CASA or guardian ad litem (GAL) doesn't cut it. CASAs and GALs are appointed to protect the best interests of the child, not necessarily to provide legal representation. *See* I.C. § 31-32-3-6.

[18] We recognize that the juvenile court here was faced with a difficult situation where Parents had tried everything in their power to help D.S. and a bed at NDI would only be available for a few more days. But when the State wants to take away the liberty of anyone, adult or juvenile, due process is required. Reading the CHINS statutes and commitment statutes together to create a workaround to our statutory procedures undermines the protections in place for individuals subject to civil-commitment proceedings and leads to children being committed without due process.

[19] Because D.S.'s placement at NDI was an involuntary civil commitment, not an admission for voluntary treatment, the juvenile court lacked the authority to approve such placement without affording D.S. a civil-commitment proceeding. Accordingly, we vacate the court's order modifying the dispositional decree and remand with instructions for the court to refer the matter to the court having probate jurisdiction to conduct a civil-commitment proceeding or to initiate a commitment proceeding itself, acting under probate law.

Reversed and remanded.


Pyle, J., concurs.


Mathias, J., dissents with separate opinion.


ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

**Mathias, Judge, dissenting.**

I respectfully dissent.

D.S. was an adopted, 15-year-old minor child with multiple, serious mental health diagnoses and treatment needs, and Parents did all that they knew to do for their child to the limit of their resources. Concerned for D.S. and for the safety of her sibling at home, Parents turned to DCS and agreed that D.S. was a CHINS. DCS, Parents, and the CASA for D.S. further agreed that she needed the in-patient mental health treatment recommended by a psychologist. Thereafter, the trial court authorized DCS to place D.S. in a mental health facility for in-patient treatment. Under these extraordinary facts and circumstances, I would affirm the trial court's authority and placement decision in this case, as the law should not require the doing of a useless thing. After adjudicating D.S. a CHINS, the juvenile court granted wardship of D.S. to DCS. The court further ordered that DCS was authorized to consent to D.S.'s medical care. I.C. § 31-9-2-134.5 provides that:

> "Wardship", for purposes of the juvenile law, means the responsibility for temporary care and custody of a child by transferring the rights and obligations from the child's parent, guardian, or custodian to the person granted wardship. Except to the extent a right or an obligation is specifically addressed in the court order establishing wardship, **the rights and obligations of the person granted wardship include making decisions concerning the:**
>
> (1) physical custody of the child;

> (2) care and supervision of the child;
>
> (3) child's visitation with parents, relatives, or other individuals; and
>
> **(4) medical care and treatment of the child.**

I.C. § 31-9-2-134.5 (emphasis added). While I acknowledge the majority's distinction between a legal guardian, a more permanent relationship, versus a wardship, which allows for temporary care and custody of a child, *See* Slip op. at 9, in *this* case, concerning *this* minor child, it is a distinction without a meaningful difference. DCS's authority over its ward, D.S., as defined by section 31-9-2-134.5, *expressly* extends to making decisions about her medical care, which includes treatment decisions regarding her mental health.

[23] I also strongly disagree with the majority's conclusion that D.S.'s placement at NDI was not an admission for voluntary treatment. D.S. was at all relevant times a minor, and as such, she had no controlling, decision-making authority concerning the healthcare she desperately needed. In addition, this case involves the unique circumstance in which *both DCS and D.S.'s Parents agreed* that D.S. was a CHINS and that, on the recommendation of a psychologist, she needed in-patient mental health treatment. Specifically, DCS and Parents entered into an agreed entry on factfinding and disposition, which the trial court accepted when it adjudicated D.S. a CHINS. And at the placement modification hearing, *Parents agreed with DCS and the CASA that it was in D.S.'s*

*best interests to receive in-patient treatment at the Neuro Diagnostic Institute.*[3] Tr. Vol. 2, p. 90. Parents turned to DCS for assistance after they had exhausted their own resources to obtain mental health treatment for D.S. and after they began to fear for the safety of D.S.'s sibling in their home. Because DCS requested modification of D.S.'s placement to NDI for in-patient mental health treatment with the agreement and consent of Parents, I can only conclude that D.S.'s admission to that facility was voluntary.

[24] I also disagree with D.S.'s assertion that allowing DCS to act *in loco parentis* with respect to providing care for a ward's mental health expands the scope of DCS's authority beyond the court's orders. As I noted above, *the General Assembly has expressly authorized a person, or in this case an agency, granted wardship over a child to make decisions concerning the child's medical care and treatment.* DCS is also required to file progress reports every three months after the dispositional decree and the juvenile court must hold periodic case reviews at least once every six months, "or more often, if ordered by the court." *See* I.C. § 31-34-21-1, -2. Moreover, DCS's implementation of a child's case plan and placement are subject to continual review by the juvenile court. These reports and safeguards are at least equal to those provided by formal commitment proceedings.

---

[3] Indiana Code section 12-26-8-1 requires the juvenile court to appoint a CASA or guardian ad litem for a child committed either voluntarily or involuntarily to a mental health facility to "represent and protect the best interests of the child".

Perhaps one might argue (and the majority does) that alternative, formal, mental health commitment proceedings might be preferable to the custom-shaped, alternative procedure used here under extenuating circumstances. However, under these unique facts and circumstances, and the unassailable protections provided to D.S. prior to her commitment, I conclude that the juvenile court was authorized to grant DCS's requested placement modification, and place D.S. at the Neuro Diagnostic Institute so that she could receive the in-patient mental health treatment she needed.